Ramon S. MAGAYANES,
Plaintiff-Appellant,

v.

T.J. TERRANCE, et al.,
Defendants-Appellees.

No. 82–2413.

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1983.
Decided Sept. 26, 1983.*
Opinion July 25, 1984.

*This appeal was originally decided by unreported order on September 26, 1983. *See* Circuit Rule 35. The panel has subsequently decided to issue the decision as an opinion.

---

Lonny Ben Ogus, Chicago, Ill., for plaintiff-appellant.

Lynn K. Mitchell, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before POSNER and COFFEY, Circuit Judges, and WYATT, Senior District Judge.**

WYATT, Senior District Judge.

Ramon Magayanes, plaintiff below, appeals from a judgment for all defendants after a jury verdict in their favor.

There were a number of motions before trial and at least two of the opinions of the District Court deciding motions are reported (496 F.Supp. 812; 542 F.Supp. 28). As the case went to trial, the claims of plaintiff were set out in three separate counts, Counts I and II in a Second Amended Complaint and Count III in a motion by plaintiff to amend the Second Amended Complaint to substitute a new Count III for that contained in the Second Amended Complaint, which motion was granted by the District Court by order filed August 19, 1981.

The claims asserted at trial were against the City of Chicago ("the City") and four police officers. They were made under 42 U.S.C. §§ 1983 and 1985. They arose out of the arrest of Magayanes for disorderly conduct and injuries (apparently not serious) sustained by him while in custody. Various claims were made of violations of plaintiff's rights under the Constitution and federal law. They were based on assertions of false arrest, of the use of excessive force in making the arrest, and while plaintiff was in custody, the use by the City of a defectively designed squadrol to carry plaintiff to jail, and negligent transport of

** The Honorable Inzer B. Wyatt, Senior District Judge of the Southern District of New York,

the prisoner to jail. (A "squadrol" is a type of automotive vehicle used by the City to transport prisoners, injured persons, and occasionally the dead.)

We have considered each of the challenges to the judgment below and find them without merit. We affirm the judgment for defendants.

1.

There was evidence from which the jury could have found that the following were some of the principal facts.

On the night of November 13, 1979, Thompson, then 17 years old, was alone at his apartment in Chicago at 1911 North Sedgwick Avenue when Magayanes knocked on his door. Thompson did not open the door but looked through the peephole and recognized Magayanes, who had done this before. Thompson at once called the police and reported a prowler at his door.

Officers Terrance and Sullivan—defendants here—were in their car on patrol in uniform that night. At about 11:30 a message came over police radio telling them to go to 1911 North Sedgwick because a prowler was there. A burglary had "just occurred" at that address on the same night and previously there had been "numerous prowler calls" from that particular address and that area. (T 150; "T" references are to pages of the trial transcript). Terrance got out of the police car, ran to the front of 1911 North Sedgwick, then looked down a side alley and saw Magayanes walking from the rear door of the first floor rear apartment (the Thompson apartment) to a rear window. Magayanes put his hands on the window and attempted to push it in. Terrance identified himself as a policeman and told Magayanes to come to him. Magayanes did so, swearing, yelling, using many obscenities, unsteady, stumbling, giving the appearance that he had been drinking. There was a smell of alcohol on his breath. Sullivan joined them. They asked Magayanes why he was

sitting by designation.

there, but could not obtain an answer. They asked for identification. Magayanes produced a wallet, then dropped it, then picked it up. He continued to shout: "[T]his whole time he had continued to yell and scream ... obscenities" (T 155). Fearing that the people in the neighborhood would be alarmed by such noise at that late hour, Terrance told Magayanes that he was under arrest for disorderly conduct, and used the police radio to have a squadrol sent to take Magayanes (who had been handcuffed) to jail. A squadrol did arrive in a few minutes, brought by Officers Baldridge and Mickleborough, also defendants here. They took Magayanes off in the squadrol, to which he had walked without trouble and entered with some assistance. Terrance and Sullivan then spoke to Thompson, who told them that Magayanes had been pounding on his door and yelling and that he telephoned the police because "his mother had instructed him that any time that this particular subject came back to call the police" (T 158).

The squadrol took Magayanes to the 18th Precinct Police Station, about two miles away. After a drive of three to five minutes, during which nothing unusual occurred, they reached the station, parked in the back, opened the door, and saw Magayanes on the floor with blood in a trickle down the side and bridge of his nose and the upper lip area. They helped him up; he then walked with them to the jail area where he was turned over to the keeper.

Terrance and Sullivan, after their interview of Thompson, had meanwhile arrived at the 18th Precinct Police Station, where they saw Magayanes and the transporting officers. They saw the trickle of blood on the face of the prisoner and spoke to the transporting officers about it. Magayanes was taken to Henrotin Hospital, two blocks away, escorted by the arresting officers. Magayanes was more combative, yelling louder, and was worse in every way than he had been before being arrested. The hospital staff tried to treat him but he refused treatment. The hospital emergency room report in evidence states that Magayanes was "uncooperative", had a

"strong alcoholic-like odor", attempted "to stage act of passing out", was "verbally abusive", "making racial slurs", and "[r]efused to have face washed" (T 182). The report concluded that his condition was "fair, no acute distress" (T 183).

Having refused any treatment at the hospital, Magayanes was then returned to the 18th Precinct Station jail. This ended the happenings on which his claims were based.

2.

The first argument for appellant (Brief, pp. 6–8) is that the arrest was wrongful because it was made without a warrant and without probable cause, specifically in that no one except the police officers were disturbed by his misconduct. Appellant claims that: "The verdict was against the evidence and the law." (Brief, p. 8). Appellant is mistaken.

There was evidence from which the jury could have found that the police were not the only persons disturbed by the disorderly conduct here. The area was inhabited; Magayanes was trying to enter an apartment house in an area where there were evidently many people living. The officers reasonably believed that these people were being annoyed by the noise from Magayanes. Specifically, Thompson, who complained to the police, heard and saw the conduct and was in fact ready to sign a formal complaint but could not do so because he was a minor.

In *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), a Section 1983 case, the Supreme Court said that "if the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional." At the same place cited, the Supreme Court also declared: "We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." The

jury evidently found that the defense had been established, and, as pointed out, there was evidence to support the verdict.

3.

██ The second argument for appellant (Brief, pp. 9–13) is in support of his claim against the City. That claim, as we understand it, is that during his ride to the Police Station, Magayanes received some injuries caused by his falling from the seat of the squadrol due to its defective design. The defect in the design is said to be principally that the interior is all metal, without padding, seat belts, hand rails, etc. The appellant claims that it is the "official policy or custom" of the City to use defectively designed squadrols to transport arrested persons (Count III as added to Second Amended Complaint).

The jury was told in the opening for plaintiff that the City "must change the type of squadrols that they use in the City of Chicago. There must be padding on them. There must be seat belts...." (T 22). It was emphasized that there was nothing "except metal" (T 22) in the interior of the squadrol. The theory urged on the jury was that Magayanes was handcuffed when driven in the squadrol; that there were turns, stops, and starts; and that he was injured when his body hit the metal interior (T 22–23).

This theory is entirely inconsistent with the story told to the jury. Magayanes testified on direct examination that two police officers "[j]ust dump me", "then push me" into the "police wagon", (T 77), and that this is when he suffered injuries.

Q As you were being put into the police wagon, did you suffer any injuries?

A Yes.

Q What part of you was injured?

A I got a face injuries, you know, cut my nose, the bridge, and cut my lips. (T 79).

\* \* \* \* \* \*

Q And when you were put in the wagon, where were you?

A Lying on the floor.

Q On the floor?

A Yes.

Q While you were in the truck, did you remain on the floor the whole time?

A Yes. (T 81).

But there were even further inconsistencies on cross-examination when Magayanes claimed that all his injuries were received *before* he got into the squadrol.

Q What were your injuries?

A Face injuries. You know, cuts on the face.

\* \* \* \* \* \*

Q And you sustained those injuries outside the apartment?

A Yes.

Q I thought you testified that you cut your nose and your lip when you were in the squadrol.

A No.

Q No?

A When I get to the squadrol already, I was bleeding you know. (T 103–04).

As against the City, however, injuries caused by the arresting or transporting officers cannot impose liability. The rule is that if the police officers commit a wrong against plaintiff, the City cannot be held liable solely because it employs the officers. In the words of the Supreme Court: "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (emphasis in original).

To avoid this rule, appellant asserts against the City that it was an official policy of the City to use a squadrol with a defective design. The burden was on appellant to prove this assertion and he offered no evidence to carry the burden. There was no evidence that any other person had been injured in a squadrol, because of its design or otherwise. There was evidence that one of the transporting officers had used squadrols to carry several hundred persons and none had been injured other than Magayanes (T 246–47), if Ma-

gayanes was in fact injured in the squadrol.

Appellant mistakenly assumes that the City had the burden of proof on this issue and complains that "the City put in *no* evidence as to why this type of squadrol was better than another." (Brief, p. 11) (emphasis in original). In fact, the City did put in such evidence (T 315–25) from a knowledgeable, expert witness, the designer and maker of the squadrol bodies. The jury could have found from this and other evidence that the squadrols were used to transport not only prisoners but accident victims, the sick, the elderly, and sometimes the dead. The design aimed for safety and sanitation. Padding, seat belts, and anything else that was loose or removable was eliminated, either because of sanitary conditions, safety for passengers, or security for police officers. It had to be possible to clean the interior with water hose and steam. Aluminum was used, seams were avoided, fasteners and sharp edges were eliminated—all to achieve smoothness for safety. The floor was aluminum with a non-skid pattern, especially for safety purposes. The seats and back rests were made of molded fiberglass, were four inches deeper than normal, and were slanted toward the rear so that the back was two inches lower than the front; this to prevent an occupant from being thrown forward.

The jury could have found on ample evidence that the squadrols were not of defective design.

### 4.

■ The third argument for appellant (Brief, pp. 14–16) is that the trial judge committed error in refusing a requested charge that "Police officers and municipalities are under an affirmative duty ... to protect the personal safety of persons in the community." Judge Shadur refused the charge on the ground that the proposed instruction was "too general" (T 312).

Not only is the instruction too general, but it is unqualified, incomplete and is, in any event, an incorrect statement of law. It leaves out completely the circumstances to which the instruction is to be applied. It was directed at the City, as well as the individuals, but the City could only be liable, as we have seen, for injury caused by official policy and not for torts of police officers. No decision is cited for appellant to support the charge requested, and we have found none. The case on which appellant seems principally to rely, *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), is not applicable. The case did not involve jury instructions; no municipality was a defendant; the dangers to the injured persons were known; and there was an alleged "unjustified and arbitrary refusal of police officers to lend aid to children endangered by the performance of official duty" (592 F.2d at 383).

Judge Shadur adequately instructed the jury as to the essential elements of a claim under 42 U.S.C. § 1983 (T 372–74) and in stating the contentions of the parties specifically referred to the claim of appellant that he was in the custody of defendants when injured (T 377).

There is nothing shown as to the refusal of the requested charge which would remotely justify a reversal of the judgment and a new trial.

### 5.

■ The fourth argument for appellant (Brief, pp. 17–18) is directed against the transporting officers, Mickleborough and Baldridge. The argument is that these two officers violated the rights of appellant as a matter of law in that he was transported on the three-to-five-minute ride to the police station in handcuffs and in that he was taken to the police station in a squadrol rather than "a padded police car" (Brief, p. 17). This Court is asked to reverse the judgment in favor of Officers Mickleborough and Baldridge and to "enter an order that [they] violated the constitutional rights of the Plaintiff" (Brief, p. 18).

To state the argument is, without more, to show that it has no merit. The plaintiff at trial moved for a directed verdict against the City (T 326–27) but not against the individual defendants. Without any objec-

tion, the issues as to the individuals were submitted to the jury. There is no showing which, after jury verdict for all of the defendants, would justify this Court on this record to order a summary judgment as to liability against two of the individual defendants.

6.

 The final argument for appellant (Brief, pp. 19–20) is that the trial judge was in error in ruling, on a motion in limine by defendants that the testimony of a witness named Franklin would not be admitted (T 128–31). Franklin was expected to testify that he had been injured while he was transported as a prisoner in a squadrol, as an effort to show a defective design of the vehicle.

The offer of proof was that Franklin would testify in relevant part that in June of 1980 he was arrested by police officers in Chicago, that handcuffed and with legs shackled he was transported in a squadrol, that during the ride he was injured by hitting the side of the floor of the squadrol, that he suffered severe injuries, and that his lips were nearly severed. In excluding the testimony as both irrelevant and prejudicial, the trial judge found that the conduct of the police officers toward Franklin was "egregious and intentional" (T 130).

The testimony of Franklin would not have been relevant. The use of the squadrol for Magayanes was in November, 1979; the use of the squadrol for Franklin was in June, 1980. The City thus could not have had, at the time of the arrest of Magayanes, any notice from the Franklin incident that the design of the squadrol might cause injury. Moreover, the injuries Franklin sustained appear to have been much more severe than the minor cuts Magayanes suffered. There was a deposition taken of Franklin, presumably by plaintiff, to which the trial judge referred in making his ruling. It appeared that some if not most of Franklin's injuries were intentionally inflicted by the police officers.

Even if testimony of the subsequent Franklin incident had been relevant, it was within the discretion of the trial judge to

exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice ..." etc. Fed.R.Evid. 403. We are satisfied that the ruling to exclude the testimony of Franklin as both prejudicial and irrelevant was well within the wide latitude of discretion allowed to trial judges in such evidentiary matters.

The judgment for defendants, entered on jury verdicts in their favor, is affirmed.