827 F.2d 195
 23 Fed. R. Evid. Serv. 708
 Lucien SHERROD, Individually and as Administrator of the
Estate of Ronald Sherrod, deceased, Plaintiff-Appellee,
v.
Willie BERRY, Frederick Breen and the City of Joliet, a
municipal corporation, Defendants-Appellants.
 No. 85-3151.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 4, 1986.
Decided Aug. 20, 1987.
 
 William W. Kurnik, Kurnik and Cipolla, Arlington Heights, Ill., for defendants-appellants.
 Andrew J. Horwitz, Horwitz and Assoc. Ltd., Chicago, Ill., for plaintiff-appellee.
 Before CUMMINGS and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.
 CUMMINGS, Circuit Judge.
 
 
 1
 Plaintiff filed this lawsuit individually and as administrator of the estate of his deceased 19-year-old son, Ronald Sherrod. The third amended complaint was in two Counts. The first Count was for wrongful death and alleged that defendant Willie Berry, a Joliet, Illinois, policeman, violated 42 U.S.C. Sec. 1983 when he shot and killed Ronald. Berry supposedly violated "the customary standard police procedures for making felony stops of motor vehicles and investigating the occupants therein, thereby setting in motion a chain of events which resulted in the death of Ronald Sherrod on December 8, 1979." Berry was also charged with violating national standards of police procedure as to the proper use of a gun and with using unreasonable force against Ronald.
 
 
 2
 Plaintiff additionally alleged in Count I that the other defendants, Joliet Chief of Police Frederick Breen and the City of Joliet, violated the same statutory provision, inter alia, through conduct "that resulted in a policy of the use of excessive force," and through failure to train and supervise Joliet police officers with respect to the proper procedures for stopping vehicles and the use of force. Plaintiff sought $13,000,000 for loss of support in Count I.
 
 
 3
 In Count II, based upon the "right to raise a family," plaintiff complained that defendants deprived him of his liberty without due process of law and his "right to the enjoyment of the result of rearing a child, his right to raise a child, [and] his right to raise a family as he sees fit." Count II sought $1,000,000 compensatory damages.
 
 
 4
 Under Count I the jury awarded Ronald's estate $850,000 for the value of his life, $300,000 for pecuniary loss to the estate and $1,700 for funeral expenses. Under Count II plaintiff individually was awarded $450,000 for the loss of parental association with Ronald. The total award was $1,601,700. In ruling on defendants' motion for remittitur, the district judge decided that the verdicts of the jury were not excessive and added that were it in his power he would have granted an additur instead of ordering a remittitur (Defendants' App. 52).
 
 
 5
 The evidence showed that on Saturday afternoon, December 8, 1979, Gary Duckworth stole $50 to $80 from a cash register at Ziggy's Plant and Gift Shop in Joliet. The owner, Janet Youngquist, went to an adjacent shop and was there directed toward Duckworth as he approached his parked car. He ran away, discarding the money which Ms. Youngquist retrieved. The police were then called and informed that there had been a robbery at the shop. Soon thereafter, the fleeing Duckworth entered Sherrod's auto repair shop and asked for a jump start for his car, which he had left near Ziggy's shop. He and Ronald left the auto repair shop in Ronald's black 1969 Cadillac, with Ronald driving.
 
 
 6
 After defendant Berry heard a radio dispatch about the robbery, he told fellow officer Richard Klepfer that the description of the suspect fit Gary Duckworth, who had been involved in petty crimes such as purse snatchings in the past, but who, according to Berry, had never committed any acts of physical violence (Tr. 1144). The dispatch did not suggest that a weapon had been used in the robbery and did not describe the suspect as being armed. Indeed a subsequent dispatch reported that a "sneak thief" had taken some money and that an employee had managed to retrieve it after giving chase.[1]
 
 
 7
 Berry, accompanied by Klepfer, drove a Scout to investigate the robbery and saw Duckworth and Ronald, both blacks, in the 1969 Cadillac in a parking lot behind a bank near Ziggy's. Berry assertedly recognized Duckworth from 100 feet away. The Cadillac began to exit the bank parking lot at 5 miles per hour. Berry signaled the Cadillac to stop a few feet to the left of the driver's side of the police car. Berry dangerously chose to confront the car head-on instead of following recognized procedures for a proper felony stop, whereby he would have positioned his car behind the Cadillac, allowing him to observe the occupants and radio for assistance from other officers if necessary. The Cadillac obeyed all of Berry's commands, but the officers drew their guns on a hunch that Duckworth was the Ziggy store robber. Berry pointed his gun at the Cadillac and ordered Ronald and Duckworth to raise their hands, which they did.[2] As Berry approached the Cadillac on foot, Ronald, who was the driver, moved his right hand, which was clenched in a tight fist, toward the center of his chest. Berry testified that Ronald placed his right hand into the left inside pocket of his coat (Tr. 1132-1133). At that point, Berry fired his gun directly at Ronald's left temple, killing him instantly. Berry later claimed that he thought Ronald was pulling a gun when Ronald, who was unarmed, put his hand into his jacket.[3] Instead he was apparently reaching for a driver's license. Berry purportedly believed that Ronald might have been an armed robber because he was in Duckworth's company.
 
 
 8
 The following October Berry resigned from the Joliet Police Department, although he had not been disciplined with respect to the Sherrod killing. Both plaintiff and his wife requested Chief Breen to delete a reference on Ronald's death certificate which implied that he was a suspected robber and to discipline Berry. After several visits from Mrs. Sherrod, Breen threatened her with arrest if she tried to see him again. Being unsuccessful with Breen or the City, plaintiff filed this suit.
 
 
 9
 Before the incident involved in this lawsuit, Berry had been involved in other incidents in which he resorted to violence. On one occasion, Berry beat a suspect over the head with a flashlight and on another occasion he shot at a suspected burglar. Defendant police chief Breen told Berry after the second incident that he should not have used deadly force on the suspect. On still another occasion, Berry pulled his revolver while engaged in an altercation with his future brother-in-law. No serious sanctions were ever imposed on Berry as a result of these other incidents, although Chief Breen testified that Berry was suspended for 10 days following the incident with his brother-in-law.
 
 
 10
 The defendant police chief testified in detail about the training given to police officers, and the disciplinary procedures that were in place to deal with misconduct by officers. As to the incident involving Ronald, Breen testified that it might have been appropriate for a police officer to shoot a robbery suspect if the suspect moved his hand into his pocket, as Ronald allegedly did, and if the officer feared for his life or that of another. He concluded that Berry had been justified in shooting Ronald.
 
 
 11
 Expert testimony was received in evidence to show that Ronald's death was caused because Breen and Joliet did not curb the use of excessive force by its police officers and did not maintain proper procedures for vehicle stops. According to the testimony, Berry should have radioed the Police Department before acting on his own. He also should have consulted fellow officer Klepfer and should not have arranged a head-on stop with the Cadillac.
 
 
 12
 Economist Stanley Smith testified that Lucien Sherrod's opportunity loss due to Ronald's death was $513,000 because he was unable to take his planned retirement. He also testified that the economic loss to Ronald's estate was $598,000 and that the "hedonic [pleasurable] value" of Ronald's shortened life caused his estate a $1.5 million to $15 million social loss. As already noted, the jury awarded much lesser amounts.
 
 
 13
 Judge Leighton filed an opinion allowing Ronald's estate to recover for the value of his life, relying on various authorities. Sherrod v. Berry, 629 F.Supp. 159 (N.D.Ill.1985). The opinion upheld economist Stanley Smith's testimony concerning the hedonic or pleasurable value of a person's life.
 
 I. Jury Instructions
 
 14
 Plaintiff asserts that defendants have waived their right to object to various jury instructions by failing to comply with the specific procedures of Rule 51 of the Federal Rules of Civil Procedure. However, the defendants did file their proposed instructions with the court and the trial judge told them that it would be satisfactory if they merely named those whose refusal they protested instead of cataloguing their objections (Tr. 1704-1705). Subsequently he filed an extensive memorandum opinion disposing of the refusal to give certain defense instructions and the giving of certain plaintiff's instructions (Defendants' App. 1-53). Plaintiff has fully responded to the alleged errors raised by the defendants (Br. 27-39). Under these circumstances defendants should not be penalized by having their objections deemed waived. Bowley v. Stotler & Co., 751 F.2d 641, 646-647 (3d Cir.1985); Stewart v. Ford Motor Co., 553 F.2d 130, 140 (D.C.Cir.1977); Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland, 202 F.2d 794, 801 (7th Cir.1953). We therefore turn to the merits of the claims of error with respect to the instructions.
 
 
 15
 Defendants contend that the trial court committed reversible error in refusing to give four instructions. In pertinent part their tendered instruction No. 26 would have told the jurors that if the defendants were merely negligent, the jury must find in their favor. The district court refused to accept that argument by stating that the evidence showed Berry deliberately drew his pistol and intentionally shot Ronald, so that a negligence instruction would have been improper as to Berry. The judge added that the other defendants had made no attempt to prove that they had acted only negligently, instead of intentionally and deliberately, so that the instruction would also have been improper as to them. Moreover, the trial judge gave over objection defendants' instruction No. 8 which provided that municipal and supervisory liability could be based only on a finding that the City established and maintained a policy or custom evidencing deliberate indifference or gross negligence in training, supervising, and disciplining its police officers, and that such policy or custom was the proximate cause of Ronald's death. Defendants have not been able to convince us that their case was defended on a negligence theory. Plaintiff's case was tried on a theory of intentional, wanton or reckless conduct. Since the record shows that negligence was not put in issue, instruction No. 26 was entirely inappropriate.
 
 
 16
 The dissent argues at great length, based on the dissenting opinion in City of Springfield v. Kibbe, --- U.S. ----, 107 S.Ct. 1114, 1116, 94 L.Ed.2d 293, that defendants' instruction No. 8, which was given verbatim, misled the jury concerning the degree of liability required to hold a municipality liable under Sec. 1983. The dissent fails to mention, however, that this instruction was proposed by the defendants. The majority of the Supreme Court in Kibbe refused to review a jury instruction to the effect that a municipality could be held liable under Sec. 1983 if it was grossly negligent in training its police officers because the defendant City did not object to the instruction and indeed proposed its own instruction to the same effect. Id. at 1115. The Court concluded that "there would be considerable prudential objection to reversing a judgment because of instructions that the petitioner accepted, and indeed itself requested." Id. at 1116. In this Circuit, it "is well-settled law that a party cannot complain of errors which it has committed, invited, induced the court to make, or to which it consented." International Travelers Cheque Co. v. Bankamerica Corp., 660 F.2d 215, 224 (7th Cir.1981). Accordingly, a party who requests an instruction cannot complain about error if the instruction is subsequently given. See Williamson v. Handy Button Machine Co., 817 F.2d 1290, 1295-1296 (7th Cir.1987); Deland v. Old Republic Life Ins. Co., 758 F.2d 1331, 1337 (9th Cir.1985); 9 Wright & Miller, Federal Practice & Procedure Sec. 2258, at 675-676 (noting, however, that a party who later recognizes an error in a requested instruction may seek to rectify that error by objecting when the instruction is given). The dissent's argument about any error in defendants' instruction No. 8 is thus improper.
 
 
 17
 Moreover, we are also troubled by the dissent's legal argument that municipal liability under Sec. 1983 may not be based on gross negligence. Although the four dissenters in Kibbe did indeed hold that a municipality's liability under Sec. 1983 for inadequate training must be premised on a finding of "deliberate indifference or reckless disregard" and not "negligence ... alone," 107 S.Ct. at 1121, that view has yet to be adopted by a majority of the Court. In Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662, also cited by the dissent, the Supreme Court expressly held that "this case affords us no occasion to consider whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." Id. at 667 n. 3. Furthermore, this Circuit, while recognizing that something more than "mere negligence" is required to hold a municipality liable under Sec. 1983, has yet to reject "gross negligence" as a basis for municipal liability. See Jones v. City of Chicago, 787 F.2d 200, 203-206 (7th Cir.1986). We therefore think that the dissent is on rather dubious ground in arguing that reversal is required based on the position taken by the dissenters in Kibbe.
 
 
 18
 Defendants' instruction No. 30 was tendered to tell the jury that police officer Berry was entitled "to use any force which he reasonably believes to be necessary to effect any arrest and any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making an arrest." The remainder of the instruction thrice refers to arrest. Here there is no claim that Berry was attempting to arrest Ronald or Duckworth, making the instruction inapt. Furthermore, the instruction was not an accurate statement of the law since the Supreme Court in Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, held unconstitutional a Tennessee statute which provided that an officer may use all necessary means to effect an arrest. Instead, Judge Leighton gave defendants' instruction No. 2 which correctly guided the jury as to a police officer's use of deadly force. That instruction stated:
 
 
 19
 If you find that at the time in question Willie Berry shot and killed Ronald Sherrod that he reasonably believed that the use of such force was necessary to prevent death or great bodily harm to himself, then you must find in favor of all of the defendants, regardless of your finding concerning Frederick Breen and the City of Joliet.
 
 
 20
 The refusal to give defendants' instruction No. 30 was not erroneous. See, e.g., Richardson v. City of Indianapolis, 658 F.2d 494, 502 n. 2 (7th Cir.1981), certiorari denied, 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657; Brandes v. Burbank, 613 F.2d 658, 669 (7th Cir.1980).
 
 
 21
 Defendants next claim that Judge Leighton should have told the jury through their proposed instruction No. 31 that the police chief and City of Joliet's failure to discipline Berry for killing Ronald was insufficient by itself to show that they maintained a policy of excessive force. This instruction was refused on the ground that it was argumentative because it omitted to mention their liability for failing to discipline Berry as well as other Joliet police officers in other instances of excessive force. See Spesco, Inc. v. General Electric Co., 719 F.2d 233, 239 (7th Cir.1983). As the trial judge pointed out, Berry's shooting of Ronald did not stand alone as a basis for determining the liability of the City and the police chief. The plaintiff had proved a series of incidents involving excessive force by Joliet police officers, all of which were known to the police chief and the City and which resulted in little or no disciplinary action. Thus the defendants' instruction lacked an evidentiary basis. Moreover, the tendered instruction is an erroneous statement of the law, for a single incident can under appropriate circumstances give rise to an inference of an actionable municipal policy under Sec. 1983. Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 1298-1300, 89 L.Ed.2d 452. Finally, defendants' instruction No. 8 was an adequate substitute because it told the jury in part, in accordance with the defendants' theory, that
 
 
 22
 [s]howing that individual officers violated a person's constitutional rights on an isolated occasion is not enough by itself to show that adequate supervisory procedures were not provided.
 
 
 23
 Defendants' final claim of instruction error was the refusal to give their instruction No. 10 and the giving of plaintiff's instruction No. 28.1. Number 10 provided:
 
 
 24
 Evidence of the alleged prior misconduct of Defendant Willie Berry can be used only to show the prior knowledge of Defendants Frederick Breen and the City of Joliet and is not to be considered in determining the liability of Willie Berry for the shooting of Ronald Sherrod.
 
 Number 28.1 provided:
 
 25
 Evidence as to any misconduct by Willie Berry prior to the killing of Ronald Sherrod can be considered only for the purpose of determining liability on the part of Fred Breen and/or the City of Joliet based on any notice or knowledge on their part as to any propensity of Willie Berry towards the use of excessive force.
 
 
 26
 However, for the purpose of determining whether Willie Berry reasonably believed that the use of deadly force was necessary to prevent death or great bodily harm to himself or another under the circumstances of this case, you may consider any prior reprimands Willie Berry may have received with regards to his use of force before December 8, 1979.
 
 
 27
 The two instructions parallel each other. Thus refused No. 10 and the first part of given No. 28.1 are virtually the same, making No. 10 unnecessary as redundant. The second part of No. 28.1 suggested that prior reprimands would be germane to determining the reasonableness of Berry's belief that deadly force was necessary at the time he shot Ronald. The defendants object that the standard for determining whether the use of force is justified is a purely objective one. Hence they argue that Berry's state of mind at the time he shot Ronald is immaterial to whether a reasonable person would conclude that deadly force was necessary to prevent imminent death or great bodily harm to himself or another. Judge Leighton believed that it was proper to instruct the jury on the factors to be considered in determining whether Berry's use of deadly force in shooting Ronald was necessary under the circumstances. He thought that the existence of prior reprimands would be relevant to whether a reasonable person in Berry's position should have known that the kind of deadly force to which Berry resorted in the Sherrod incident was unwarranted.
 
 
 28
 Defendants are correct in arguing that the appropriate standard is an objective one. To the extent that the instruction attempted to interject a subjective element into the excessive force inquiry, it is indeed problematic. However, in reviewing the adequacy of jury instructions in a civil trial, this Court "must look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." See Wilk v. American Medical Ass'n, 719 F.2d 207, 218 (7th Cir.1983) (quoted in Ramsey v. American Air Filter Co., 772 F.2d 1303, 1312 (7th Cir.1985)). Moreover, "[e]ven if we should discern error in one or more instructions, we will not reverse a judgment--especially after [a lengthy] trial--unless we are persuaded the jury's understanding of the issue was seriously affected, to the prejudice of the [complaining party]." Wilk, 719 F.2d at 218-219; see Beard v. Mitchell, 604 F.2d 485, 498 (7th Cir.1979).
 
 
 29
 As set out above, the jury was instructed at the defendants' request to return a verdict in favor of the defendants if it found "that at the time in question Willie Berry shot and killed Ronald Sherrod that he reasonably believed that the use of force was necessary to prevent death or great bodily harm to himself." (Defendants' instruction No. 2). They were also instructed not to consider evidence as to any prior misconduct by Berry in determining his individual liability. Although Judge Leighton should not have instructed the jury to consider any prior reprimands which Berry may have received with regard to his use of force, the evidence presented at the trial indicated that Berry had been reprimanded only once prior to the Sherrod incident and, as just recounted, the jury was expressly told to disregard evidence of the misconduct leading to the reprimand. After viewing the instructions as a whole in light of the facts of this case and the evidence presented, we cannot conclude that this error was so prejudicial to the defendants as to constitute reversible error requiring a new trial. See Brandes v. Burbank, 613 F.2d 658, 668-669 (7th Cir.1980).
 
 II. Evidentiary Rulings
 
 30
 Defendants have asked us to review three evidentiary rulings of the trial court. The plaintiff contends that the defendants have waived their right to challenge these rulings on appeal because they did not object to the admission of the evidence at trial. These matters, however, were raised in defendants' motions in limine which sought to exclude: (1) the fact that Ronald was unarmed; (2) the lawsuits by Thompson and Bucciarelli against Joliet police officers, and (3) economist Stanley Smith's testimony as to the value of life. All are treated in the district judge's opinion overruling the new trial motion (Defendants' App. 37-39, 35-37 and 24-25) and were argued on the first day of trial. With this background, it was unnecessary under Rule 46 of the Federal Rules of Civil Procedure for defendants to have renewed their objections at the time the evidence was admitted. Thronson v. Meisels, 800 F.2d 136, 142 (7th Cir.1986); Cook v. Hoppin, 783 F.2d 684, 691 n. 2 (7th Cir.1986); American Home Assur. Co. v. Sunshine Supermarket, Inc., 753 F.2d 321, 324-325 (3d Cir.1985); Sprynczynatyk v. General Motors Corp., 771 F.2d 1112, 1118-1119 (8th Cir.1985), certiorari denied, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572; Sheehy v. Southern Pac. Trans. Co., 631 F.2d 649, 652-653 (9th Cir.1980); contra Collins v. Wayne Corp., 621 F.2d 777, 784 (5th Cir.1980). There was no waiver.
 
 A. Ronald was not armed
 
 31
 Defendants sought to exclude evidence indicating that Ronald was unarmed at the time of the shooting. They claim that such evidence is not relevant to whether Berry reasonably believed that the use of deadly force was justified at the time of the shooting and that its admission was highly prejudicial to Berry.
 
 
 32
 The district court ruled that evidence as to whether Ronald was armed was both relevant and material to determining whether Berry acted reasonably when he shot and killed Ronald. Berry defended his shooting on the ground that Ronald made a "furtive" movement of his hand toward a pocket of his coat, leading him to infer that Ronald was armed and hence presented a danger to Berry. The district court was concerned that excluding the evidence which showed that Ronald was unarmed would unfairly prejudice the plaintiff by allowing the jury to labor under the false assumption that Ronald was in fact reaching for a gun with which to shoot Berry.
 
 
 33
 It is well settled in this Circuit that "[t]he district court has broad discretion to determine the admissibility of evidence, and thus [the Court of Appeals] will reverse the court's evidentiary rulings only upon a clear showing of abuse of discretion." United States v. Garver, 809 F.2d 1291, 1297 (7th Cir.1987); Davis v. Lane, 814 F.2d 397, 399 (7th Cir.1987). It is apparent that one of the parties would have suffered some prejudice regardless of what decision the district court reached regarding admissibility. Under these circumstances we are particularly hesitant to second-guess the district court's balancing of prejudice and probative value. See, e.g., Davis, 814 F.2d at 399; Kier v. Commercial Union Insurance Cos., 808 F.2d 1254, 1258 (7th Cir.1987); West v. Love, 776 F.2d 170, 174 (7th Cir.1985).
 
 
 34
 Defendants argue that any prejudice to the plaintiff resulting from exclusion of the evidence demonstrating that Ronald was unarmed could have been cured by a cautionary instruction to the effect that whether or not Ronald was armed was irrelevant to the determination of the reasonableness issue. However, defendants could just as easily have requested a similar instruction to minimize the prejudice to them of admitting the evidence. No such instruction was requested. Furthermore, as discussed in Part I supra, the jury was instructed, in accordance with Tennessee v. Garner, 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1, to find in favor of the defendants if "at the time in question Willie Berry shot Ronald Sherrod he reasonably believed that the use of such force was necessary to prevent death or great bodily harm to himself." (Defendants' instruction No. 2). Finally, we consider defendants' entire line of argument to be somewhat disingenuous since if Ronald had been armed, we are confident that they would have insisted on introducing evidence proving that fact so that the jury would not unfairly speculate that Ronald was unarmed. See Davis v. Lane, 814 F.2d 397, 399 (7th Cir.1987) (fact that prison inmate was armed with a knife was properly admitted in Sec. 1983 action against guard who shot him).
 
 
 35
 By allowing into evidence the fact that Ronald was unarmed, the district court reasonably resolved a difficult and close issue. We cannot say that its resolution was a clear abuse of discretion.[4]
 
 
 36
 B. The lawsuits against Berry and Joliet police officers
 
 
 37
 Evidence was admitted concerning the lawsuit by Michael Thompson, the suspect whom Berry had beaten over the head with a flashlight, against Berry, the Joliet Police Department, and the City of Joliet, and another lawsuit by a plaintiff named Bucciarelli against several other Joliet police officers, which was the result of an incident which occurred one month after the shooting of Ronald Sherrod. Defendants contend that this evidence was not probative of any issue in the case and was highly prejudicial. The district court admitted evidence of these matters for the limited purpose of showing that Breen and the City of Joliet knew that Berry and other police officers had been charged with the use of excessive force, belying the assertion of proper training and corrective action by Chief Breen and the City (Defendants' App. 36-37). This Court has consistently recognized that the "trial court's balancing of probative value and unfair prejudice is highly discretionary and its decision on admissibility will be accorded 'great deference.' " West v. Love, 776 F.2d 170, 174 (7th Cir.1985) (quoting United States v. Medina, 755 F.2d 1269, 1274 (7th Cir.1985)); see United States v. Beasley, 809 F.2d 1273, 1278 (7th Cir.1987); United States v. Laughlin, 772 F.2d 1382, 1392 (7th Cir.1985). No error was involved in admitting this testimony.
 
 
 38
 The dissent objects to the admission of the fact of the Bucciarelli lawsuit on the ground that the incident giving rise to the suit occurred one month after Berry shot Ronald and hence was irrelevant to determining whether the City and the chief of police maintained an improper policy regarding the use of force at the time of Ronald's death. Although the defendants on appeal complained about the admission of the fact of the Bucciarelli suit because it "had no probative value whatsoever regarding any issue in this lawsuit" (Def. Br. 37), they never specifically challenged its admission on the ground seized upon by the dissent. The dissent cannot urge reversal on a ground that has been waived. See Ohio Casualty Insurance Co. v. Bazzi Construction Co., 815 F.2d 1146, 1149 (7th Cir.1987); National Fidelity Life Insurance Co. v. Karaganis, 811 F.2d 357, 360 (7th Cir.1987).
 
 
 39
 Furthermore, the case upon which the dissent relies, Magayanes v. Terrance, 739 F.2d 1131 (7th Cir.1983), did not involve municipal liability under Sec. 1983. In Magayanes, this Court held that evidence of an incident occurring six months after the one at issue in the case was not relevant to whether the defendants at that earlier time had notice that the design of a police vehicle used to transport prisoners was defective. In contrast, in a case specifically involving municipal liability, the Fifth Circuit held that subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy. Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir.1985), certiorari denied, --- U.S. ----, 107 S.Ct. 1369, 94 L.Ed.2d 6860. The court emphasized the difficulties that a Sec. 1983 plaintiff is likely to encounter in attempting to prove the existence of an official municipal policy or custom at the time of the incident in which he was injured. Id.
 
 
 40
 C. Economist Smith's testimony as to the value of Ronald's life
 
 
 41
 The defendants also contend that the trial court erred in admitting the expert testimony of Stanley Smith, an economist, as to the economic value of a lost human life. In essence defendants object that the testimony was too speculative to be admissible. As will be discussed further below, it is well settled in this Circuit that Sec. 1983 permits recovery on behalf of the victim's estate for the loss of life. Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir.1984); Bass v. Wallenstein, 769 F.2d 1173 (7th Cir.1985). It is therefore axiomatic that plaintiffs seeking to recover the value of a decedent's life must be entitled to submit expert testimony to help guide the jury in reaching an appropriate damages award.
 
 
 42
 Mr. Smith testified as to how a life is valued in the field of economics. Smith was well qualified to discuss this matter, and indeed defendants did not question his qualifications at trial. Sherrod v. Berry, 629 F.Supp. 159, 162 (N.D.Ill.1985). The defendants certainly could and should have submitted contrary expert testimony. They failed to do so and therefore cannot be heard now to complain that the plaintiff's expert's testimony was too speculative or somehow unreliable.
 
 
 43
 The trial judge ably addressed defendants' arguments contesting the admissibility of Mr. Smith's testimony concerning the hedonic value of human life, 629 F.Supp. 159 (N.D.Ill.1985). Judge Leighton explained that the rule against recovery of "speculative damages" applies where it is uncertain whether the defendant caused the damages, or whether the damages flowed from his act. The fact that the measure or extent of the injury suffered may be uncertain does not bar recovery. Judge Leighton concluded, "The fact that the hedonic value of a human life is difficult to measure did not make either Smith's testimony or the damages speculative." 629 F.Supp. at 164.
 
 
 44
 The testimony of expert economist Stanley Smith was invaluable to the jury in enabling it to perform its function of determining the most accurate and probable estimate of the damages recoverable for the hedonic value of Ronald's life. The trial court committed no error by admitting that testimony.
 
 D. Berry's prior police misconduct
 
 45
 Defendants contend that evidence of Berry's prior police conduct involving his use of excessive force in three other incidents was wrongly admitted. We cannot agree. Municipal liability under Sec. 1983 is premised on the plaintiff's proving that his constitutional rights were violated as a result of an official municipal policy or custom. Monell v. Department of Social Services, 436 U.S. 658, 690-691, 694, 98 S.Ct. 2018, 2036, 2037, 56 L.Ed.2d 611. The Supreme Court has recently indicated that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791. Thus a plaintiff must prove a specific pattern of conduct or series of incidents violative of constitutional rights in order to establish the existence of a municipal policy or custom. See Hossman v. Blunk, 784 F.2d 793, 796-797 (7th Cir.1986); Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir.1985); Strauss v. City of Chicago, 760 F.2d 765, 767-769 (7th Cir.1985).
 
 
 46
 Defendants complain that several of the incidents admitted into evidence by the plaintiffs to establish a municipal policy involved Officer Berry. While this evidence was admittedly prejudicial with respect to Berry, it was highly probative as to the existence of a municipal policy of Joliet to maintain on its police force officers who consistently used excessive force in discharging their official duties, the touchstone of municipal and supervisory liability under Sec. 1983. The trial court admitted the evidence of the prior incidents only against Chief Breen and the City to show that they had knowledge of Berry's prior use of excessive force and failed to take adequate corrective action (Tr. 220-223, 463; Defendants' App. 29-35). The incidents were never proved against Berry. As requested, a cautionary instruction was given at the time the evidence was admitted (Tr. 222-223, 463), and a final limiting instruction, plaintiff's instruction No. 28.1 set out above in Part I, was given to the jury at the close of the trial. As explained above, the trial court's balancing of the probative value and prejudicial effect of evidence is highly discretionary. West v. Love, 776 F.2d at 174. In this setting the trial court did not abuse its discretion in admitting the three prior incidents involving Berry into evidence.
 
 
 47
 The dissent objects that evidence of one of the incidents involving Berry's prior use of force was improperly received against Berry himself. In this incident Berry shot at a suspected burglar named Waddell after an auto chase when Waddell emerged from his car in a crouched position with his hand in his coat. When evidence of this incident was introduced, Judge Leighton did not instruct the jury, as he had prior to the introduction of evidence of the other two incidents involving Berry, that the evidence was admissible only against the police chief and the City, and not against Berry individually. In addition, in a memorandum opinion disposing of the post-trial motions, Judge Leighton indicated that he believed that evidence of the Waddell incident could come in against Berry because it was so factually similar to the Sherrod incident that it showed a consistent pattern of conduct (Def.App. 35). However, at the conclusion of the trial, the jury was clearly instructed that:
 
 
 48
 Evidence as to any misconduct by Willie Berry prior to the killing of Ronald Sherrod can be considered only for the purpose of determining liability on the part of Fred Breen and/or the City of Joliet....
 
 
 49
 (Plaintiff's instruction No. 28.1). The instruction given made no exception for the Waddell incident. The jurors took a written copy of this final instruction into their deliberations and hence it was undoubtedly this instruction to which they referred for guidance in reaching their verdict. The importance of this final instruction is further evidenced by the fact that when Judge Leighton did give cautionary instructions prior to the introduction of evidence of the other two incidents, he told the jury that they would understand the effect of the limitation contained in the cautionary instructions only at the conclusion of the trial after he had instructed them on the law.
 
 
 50
 Consequently, we believe that this final limiting instruction sufficiently countered any confusion which might have existed at the time the evidence of the Waddell incident was introduced and that the jury did not consider that incident in determining whether Berry had a reasonable belief that deadly force was necessary when he shot Ronald. Evidence of the Waddell incident was without question admissible against the police chief and the City to establish an official municipal policy or custom, and any residual prejudice to Berry as a result of its admission was not so great as to warrant reversal.
 
 
 51
 III. Loss of life is compensable to the deceased's estate
 
 
 52
 The district court permitted the jury to consider awarding Ronald's estate the value of his life. As defendants admit (Br. 44), this ruling accords with our recent decisions in Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir.1984), and Bass v. Wallenstein, 769 F.2d 1173 (7th Cir.1985). Defendants have not persuaded us to overrule these authorities. See also R. Posner, Tort Law: Cases and Economic Analysis 121-122 (1982).
 
 
 53
 IV. Award to Lucien for loss of parental association
 
 
 54
 Defendants concede that the parent-child relationship is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment (Br. 44), see Bell, 746 F.2d at 1242-1245, but they assert its loss is not compensable absent a specific intent to sever it. This argument was waived because it was not raised in their post-trial motions nor in any proposed instruction requiring a showing of specific intent for a loss of parental association claim. In fact there was no objection to plaintiff's instruction No. 19(a) which did not impose such a requirement.
 
 
 55
 Even if this argument were not waived, it is foreclosed by Bell and Bass, supra. In recognizing that the right to parental association was a liberty interest protected by the Due Process Clause, this Court did not impose any state of mind requirement necessary to a finding of a deprivation. Bell, 746 F.2d at 1243-1245. Defendants rely on Trujillo v. Board of County Comm'rs, 768 F.2d 1186 (10th Cir.1985), in arguing that a specific intent to violate the right to parental association is required in order to state a claim under Sec. 1983. Trujillo is distinguishable from Bell because the Tenth Circuit grounded the right to parental association in the First Amendment whereas we based the right on the Due Process Clause. Id. at 1189-1190. A First Amendment violation requires "proof that the state's action was intended to repress an individual's protected speech or association." Id. at 1189. Consequently, the Tenth Circuit held that an allegation of specific intent to interfere with the parental relationship was required to establish a constitutional violation. Id. at 1190. The Fourteenth Amendment's Due Process Clause, in contrast, contains no such requirement of specific intent. Id. (noting that Bell imposed no specific state of mind requirement to find deprivation of intimate associational rights). Despite the Tenth Circuit's decision in Trujillo, we are bound by our decision in Bell and the plaintiff has sufficiently made out a violation under Sec. 1983.
 
 
 56
 The defendants also argue that the Supreme Court's recent decision in Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662, prohibits an award of damages to Lucien Sherrod for the loss of his right to parental association. In Daniels, the Court held that mere negligence cannot constitute a due process violation actionable under Sec. 1983. Defendants argue that it is impossible to interfere intentionally with a parent-child relationship absent some knowledge of the existence of that relationship. However, the Supreme Court in Daniels acknowledged that liability under the Due Process Clause could be premised on recklessness or gross negligence. 106 S.Ct. at 667 n. 3. As discussed above in Part I, the record clearly indicates that the defendants acted recklessly and with gross negligence. Thus damages were properly awarded to Lucien Sherrod.
 
 
 57
 V. Evidence of business performance of Sherrod Auto Repair after Ronald's death.
 
 
 58
 The district judge refused to admit evidence of the performance of Sherrod's auto repair shop after Ronald died. He did admit evidence showing the value of the auto repair business while Ronald worked there and contributed to its earnings, but held that events occurring there after Ronald's death "were not probative of what the garage would have earned had he not been killed" (Defendants' App. 43). There was no error in confining such evidence to Ronald's lifetime because the evidence that was admitted provided a sufficient basis for calculating his projected contributions over his expected life span.
 
 VI. Right to remittitur
 
 59
 As shown, Lucien Sherrod as administrator of Ronald's estate recovered a total of $1,151,700. The jury awarded the estate $850,000 for the value of Ronald's life, $300,000 for pecuniary loss to the estate, and $1,700 for funeral expenses. $450,000 was awarded Lucien individually for loss of parental association with Ronald under Count II. Defendants have made no real attempt to show, as required, whether the verdicts were monstrously excessive or so large as to shock the conscience of the court, thus justifying a remittitur. Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1275 (7th Cir.1983). When asked at oral argument, the only suggestion of defendants' counsel was to remit the $850,000 award, but they refused to provide the Court with any figures as to the approximate size of an appropriate award. The defendants' brief attacked the entire Count I verdict of $1,151,700 and the Count II verdict of $450,000 (Br. 51), but again offered no guidance as to paring these amounts. The trial judge held that the verdicts were not excessive and that he would grant an additur if it were in his power (Defendants' App. 52). In response, plaintiff has merely stated that any remittitur would be "offensive" (Br. 50).
 
 
 60
 In Memphis Community School Dist. v. Stachura, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249, a tenured public school seventh-grade teacher was suspended and later reinstated. He sued for damages under 42 U.S.C. Sec. 1983. The jury found the defendant School District and others liable for a deprivation of procedural due process and for a violation of plaintiffs First Amendment rights. Plaintiff was awarded $266,758 in compensatory damages and $36,000 in punitive damages. Under erroneous instructions, the compensatory damages were based on plaintiff's actual injury and on the abstract value of certain constitutional rights. In remanding for a new trial, the Supreme Court held that the appropriate level of damages for violations of constitutional rights should ordinarily be determined according to common law tort principles. It reaffirmed its ruling in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252, that no compensatory damages can be awarded for infringement of constitutional rights absent proof of actual injury. Damages must only compensate for actual harm.
 
 
 61
 In Stachura, the instructions "called on the jury to measure damages based on a subjective evaluation of the importance of particular constitutional values." 106 S.Ct. at 2545. There were no such instructions in the present case. Likewise the damages here were awarded to compensate the plaintiff in both his capacities (as administrator and individually) for actual injuries caused by a constitutional violation. Therefore Stachura does not require a remand.
 
 
 62
 If we were the jurors, our award might have been substantially less than the $1,601,700 rendered, but we can take judicial notice that many higher awards have been sustained in loss of life cases. In this case there has been a complete absence of any suggestions at either the oral argument or in defendants' principal brief as to the proper amount of a remittitur. The district court believed that none was proper. In their reply brief, defendants seem to say there should have been no allowance for the loss of Ronald's life (for which the jury awarded $850,000) and no allowance for loss of parental association (for which the jury awarded $450,000) (Reply Br. 17-18). We cannot agree with such "all or nothing" arguments and therefore no remittitur will be directed.
 
 
 63
 VII. Sufficiency of evidence as to Police Chief's and City's liability
 
 
 64
 Defendants' final argument is that for want of evidence, the judgments against Chief Breen and the City cannot stand. It is noteworthy that defendants' reply brief makes no effort to support this argument.
 
 
 65
 In his memorandum opinion of November 15, 1985, Judge Leighton summarized the evidence as to Breen and the City as follows (Defendants' App. 49-51):
 
 
 66
 In this case, the facts are entirely different [from those in People v. Lenard, 79 Ill.App.3d 1046 [35 Ill.Dec. 104, 398 N.E.2d 1054] (1st Dist.1979) ]. There was evidence, much of it the testimony of Berry, the defendant Breen, and police officers of the City of Joliet, supported by records of the defendant City, which proved to the jury that Willie Berry was a violence-prone policeman who, on a number of occasions, had used excessive force, in fact, lethal violence on citizens with whom he came in contact; that this proneness for violence culminated in the killing of Ronald Sherrod by Berry on December 8, 1979. There was evidence that the chief of police, Breen, knew of Berry's acts of violence, but he did not take steps to correct them. All of the facts concerning Berry's conduct were recorded in documents in the possession of Breen and the defendant municipality. These facts were known to the corporation counsel of the city, who as the city's lawyer, came in contact with police officers like Berry and learned of incidents involving the use of excessive force by Joliet police officers.
 
 
 67
 Finally, this case is to be distinguished from Lenard. The evidence in the record, on which the verdicts were returned and the 16 special interrogatories were answered in the affirmative, was such that the jury could have and did find that the City of Joliet maintained a policy of employing a police force with police officers like Berry, and others, who regularly used excessive force and lethal violence in the discharge of their duties; and that Breen, the police chief, executed the policy of the city. Dr. Fyfe, an expert on police practices testified, as he had in the first trial, without being contradicted or refuted, that from records in the possession of Breen and the city, he was able to conclude that of the 54 largest cities in the United States, Joliet had the highest rate of incidents in which police officers fired their guns at citizens in the course of discharging their duties. Breen was present at both trials, and testified in both. Yet he never said a word either questioning or denying the assertions of Dr. Fyfe; and when Dr. Fyfe was cross-examined, Tr. 746-886, defense counsel never asked him about this aspect of his testimony. In sum, what this widely respected expert told the jury was that Joliet, an obscure Illinois municipality, had earned the dubious distinction of being the city, among the 54 largest in the country, where citizens could expect to be fired on by police officers with greater regularity than anywhere else in the country.
 
 
 68
 For these reasons, and without dwelling more on the ample evidence in the record, this court concludes that the jury's verdicts finding that Breen and the City of Joliet maintained a police force that used excessive and lethal force against citizens are supported by evidence as required by law. The [affirmative] answers to the 16 special interrogatories [reproduced in Defendants' App. 65 and in Plaintiff's Supp.App. 7-21] find support in the evidence; the jury found in them that Breen and the City of Joliet maintained Berry and other police officers who used excessive force on citizens; and appropriate ones found that the policy and practice of Breen and the City of Joliet were factors that caused the death of Ronald Sherrod on December 8, 1979.
 
 
 69
 That is a fair summing up of the evidence which we adopt as our own. Defendants' sufficiency argument must be rejected.
 
 
 
 The judgments are affirmed.[5]
 COFFEY, Circuit Judge, dissenting.
 Law enforcement officers perform a vital function in our society in preserving the peace. In performing this all-important function, their every heartbeat is in constant peril. Federal Bureau of Investigation statistics establish that of the 63 officers killed in 1986, almost 50% ( 29/63 ) were killed in situations not unlike the one Officer Willie Berry faced in the present case.[1] Law enforcement officers killed by gunshot during the eleven-year period from 1976 to 1986 were most often within ten feet of their assailants at the time of the fatal encounter. FBI statistics further establish that patrol officers have consistently comprised the largest percentage of victims throughout the past decade. The United States Supreme Court has "[s]pecifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977).
 The Majority opinion improperly upholds a verdict that handcuffs law enforcement officers in their efforts to protect the public while fulfilling their sworn duty to uphold the law. In effect, the Majority decision tells the law enforcement officer "You can't shoot even if you believe you are in immediate danger of serious bodily injury or death." As one court has stated "the cemeteries and police stations contain living epitaphs of those dedicated ... officers who failed to take reasonable precautions for their own protection." State v. Coles, 20 Ohio Misc. 12, 18, 249 N.E.2d 553, 559 (1969). I know of no requirement in the law that police officers must allow a suspect to fire at them before they are allowed to protect themselves and their partner when they have reasonable grounds to believe the suspect is armed and dangerous as in the instant case.
 The Majority sidesteps the real issue in this case: whether Officer Berry acted reasonably based on the collective knowledge and information he possessed when he stopped the car, approached the occupants and fired his revolver in response to what he believed to be a furtive movement that he believed to be life-threatening to himself and his partner. Because of the numerous errors in the admission of evidence and the district court's erroneous, misleading, and confusing jury instructions which presented a prejudicial picture of the defendants that no amount of evidence could surmount, I dissent.
 
 
 *
 FACTS
 On December 8, 1979, the operator of a variety shop in Joliet, Illinois reported that there had been a "robbery" at the shop. Officer Willie Berry, a black policeman on duty, heard a radio transmission recounting the "robbery" and describing the suspect. From the description given of the robbery suspect in the radio transmission Officer Berry concluded that it was in all probability Gary Duckworth, who like Officer Berry also was black. Officer Berry testified at trial that he previously knew Duckworth to have been a suspect in other assaultive crimes such as "robberies and purse snatchings." I am hard pressed to understand how the Majority can refer to such seriously violent and assaultive felony crimes as robbery and purse snatching as "petty": "[t]he description of the suspect fit Gary Duckworth, who had been involved in petty crimes in the past." Majority at 198.[2]
 After receiving another radio communique that the suspect had returned to the area of the robbery ("stick-up"), Officer Berry and his partner, Officer Richard Klepfer, proceeded to the crime scene in their squad car. Testimony at trial by Officer Berry established that he believed a "stick-up"[3] had taken place and the Majority concedes that Berry thought he was investigating a robbery:
 Q: And he said some kind of robbery, right?
 A: [Officer Berry] He also said the subject spoke with a speech impediment, which would lead me to believe it is a face-to-face crime, which means a robbery, not a sneak thief, a face-to-face crime is a robbery. So this is a stick-up. That is a face-to-face crime.
 (Emphasis added). There is nothing in the record to establish that Berry heard a subsequent transmission stating that the Ziggy's incident involved a "sneak thief." In fact, Berry testified that he did not hear the "sneak thief" transmission and his testimony on this point was neither challenged nor controverted.
 In driving to the robbery sight, Officer Berry observed two black men (Ronald Sherrod and Duckworth) sitting in a Cadillac in a bank parking lot and having heard a description of a robbery over the police radio he had every reason to believe that the one of the car's occupants was armed and dangerous. Berry testified:
 
 
 Q
 You saw they were black people in the vehicle, and you thought that was also suspicious, since it was a white neighborhood, correct?
 
 
 A
 Partially, yes, sir
 
 
 Q
 And you also knew that a crime had been committed a block away, correct?
 
 
 A
 Yes, sir
 Officer Berry decided to stop the Cadillac and investigate. The Cadillac proceeded out of the parking lot and onto the street where Officers Berry and Klepfer were patrolling. Berry explained that he turned on the squad car's "Mars lights," and motioned the driver of the Cadillac to pull over. As the Cadillac approached the officers' car, Berry recognized Duckworth as one of the occupants of the Cadillac and thus when he stopped the Cadillac, Berry believed he was apprehending the robbery suspect. The Majority states that "[h]ere there is no claim that Berry was attempting to arrest Ronald or Duckworth...." I fail to understand how the Majority can conclude that Officer Berry was not attempting to arrest the occupants in the Cadillac. Although Berry initially decided to stop the Cadillac to investigate, upon recognizing Duckworth, Berry obviously concluded that he was apprehending the suspect in the robbery committed moments before. Clearly, an officer must stop and obtain control of a suspect before effectuating an arrest. Officer Berry's actions in drawing his gun and ordering his partner to cover the suspects clearly demonstrate that Berry believed he was doing something beyond merely making an investigatory stop. As the Majority concedes, it was in fact the suspect Duckworth who had been involved in the alleged robbery at Ziggy's, and thus Berry's belief that he was apprehending the robbery suspect was well-founded and justified. As the suspects' car slowed to a stop, Officer Berry exited the vehicle, removed his gun from his holster since he believed the stop to be one of high risk as he suspected that the occupants were armed and were the suspects in the robbery ("stick-up") committed moments before.[4] The police vehicle and the car driven by Ronald Sherrod stopped with their front bumpers approximately parallel to each other, the Cadillac facing south and the police vehicle pointed north.[5] Officer Berry believing that the two occupants in the car were involved in a "stick-up," assumed a position outside his vehicle with his gun pointed at the occupants of the Cadillac. Following accepted police arrest procedures, Berry ordered the occupants to raise their hands to prevent them from reaching for a concealed weapon. The two suspects were defiant in that they hesitated to follow the officer's command to raise their hands;[6] the record is clear that the suspects did not comply with Berry's commands immediately as the Majority implies: "Berry pointed his gun at the Cadillac and ordered Ronald and Duckworth to raise their hands, which they did." Majority at 199. When in fact, Officer Berry was required to repeat his command to "raise your hands" to the suspects three times before the suspects decided to comply; this recalcitrance on the part of the suspects further aroused Berry's suspicion as to the imminent danger confronting him. Officer Berry testified that "It seemed to me as though the passenger [Duckworth] was looking at the driver as more or less 'what are we going to do next?' "[7] Berry asked his partner Klepfer who had drawn his gun when Berry began to exit the squad car if Klepfer had the suspects under cover to which Klepfer responded affirmatively. At this time, Officer Berry raised his gun and approached the Cadillac. While approaching the suspects' vehicle, he observed the driver of the vehicle suddenly reach into his coat as if reaching for a weapon. Officer Berry, based on the suspects' refusal to raise their hands until he had given the command three times and the sudden movement of Sherrod's hand into an area where a weapon could easily be concealed (inside his coat) as well as his suspicion that an occupant of the car had participated in a "stick-up" moments before and thus believed that the occupants were in all probability armed. Thus Berry had every reason to believe based on these circumstances that Sherrod was about to pull a weapon from his coat. Therefore, he fired his revolver at Sherrod in order to protect himself and his partner from the threat of great bodily harm or imminent death he reasonably believed existed. The shot killed Sherrod instantly. The Majority speculates that Sherrod "was apparently reaching for a driver's license." Since Officer Berry had not requested the occupants of the Cadillac to provide identification, the Majority's speculation as to what Sherrod was doing when he quickly moved his hand into his coat is without any basis in the record. Indeed, the Majority initially claimed that Sherrod was reaching for a cigarette lighter, since a lighter was also found (along with a driver's license) in Sherrod's shirt pockets. Officer Klepfer, Berry's partner at the crime scene, testified that Sherrod made a "quick" movement with his hand into his coat and "there was no doubt in my mind when he started to move, he was going to reach for a weapon of some type."[8] At trial, Joliet Chief of Police Fred Breen testified that Officer Berry was justified in firing his gun:
 
 
 Q
 Now, in the Sherrod incident you feel that Officer Berry was justified or unjustified in shooting Ronald Sherrod?
 
 
 A
 Under the circumstances I think he was justified
 Lucien Sherrod, the father of the deceased, filed a 42 U.S.C. Sec. 1983 action individually and as administrator of his son's estate. The complaint included two counts, the first count alleging that Officer Berry violated 42 U.S.C. Sec. 1983 when he shot and killed Ronald Sherrod and also that Chief of Police Breen and the City of Joliet violated 42 U.S.C. Sec. 1983 through their improper policy regarding the use of force and a failure to train the Joliet police officers concerning the correct procedures for making felony stops of vehicles and the use of deadly force. Count II alleged that the defendants deprived the plaintiff of his right to raise a family without due process of law. The jury found for the plaintiff on both counts awarding $1,601,700 in damages.
 II
 
 
 A
 Improper Admission of Evidence that Sherrod was Unarmed
 The Majority improperly upholds the trial court's admission of prejudicial evidence of a search of the suspects and the vehicle after the shooting that turned up no weapons. Decisions regarding the admission of evidence may be reversed if the trial judge abused his discretion. Prudential Insurance Company of America v. Miller Brewing Co., 789 F.2d 1269, 1279 (7th Cir.1986). The question before the jury in this case was simply whether Officer Berry acted reasonably based on the collective knowledge and information he possessed when Berry stopped the car, approached the occupants to investigate prior to making an arrest, and fired his revolver in response to what he perceived to be a life-threatening movement by one whom he believed was armed. Evidence that Sherrod was unarmed obtained after the fact (of the shooting) has no bearing on the reasonableness of Officer Berry's actions since it allows his actions to be judged on the basis of information that he did not have at the time he responded to Sherrod's furtive and potentially life-threatening rapid movement.
 The receipt of the after-the-fact evidence by the jury that Sherrod was unarmed, knowledge that Officer Berry did not have, was not relevant and obviously extremely prejudicial to determining "whether a reasonable person would conclude that deadly force was necessary under the circumstances," since the Federal Rules of Evidence provide only for the admission of
 "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence."
 Fed.R.Evid. 401, 402. What is relevant and crucial to determining whether Berry acted reasonably in using deadly force is the collective knowledge and information that he (Officer Berry) possessed immediately prior to and at the very moment he fired the fatal shot. Thus, the reception of any evidence that fails to demonstrate or explain what Officer Berry knew or believed at the time he fired his revolver is irrelevant to determining whether Officer Berry acted reasonably.
 The record demonstrates that Berry shot Sherrod because he believed in the split second he had to react to Sherrod's furtive rapid movement that he and his partner were in imminent danger of great bodily harm or losing their lives. As Officer Klepfer testified, Sherrod made a "quick movement with his hand into his coat " and "there was no doubt in my mind when he started to move, he was going to reach for a weapon of some type." Officer Berry never claimed that he actually saw a weapon, but simply reacted to what would be considered by a reasonable person to be an imminently dangerous life-threatening situation. We as judges have hours, days, weeks, even months to analyze and decide whether an officer's actions were proper and reasonable, whereas the officer in the line of duty has only seconds to make that same judgment.
 In Young v. City of Killeen, Tex., 775 F.2d 1349 (5th Cir.1985), Carolyn Young brought a 42 U.S.C. Sec. 1983 and wrongful death action against City of Killeen police officer Kenneth Olson, Police Chief Frances L. Giacomozzi and the City of Killeen for the shooting and killing of her husband David Young. The Fifth Circuit stated the material facts:
 "David Young, with a friend, drove to a parking lot in an area of Killeen where they could buy marijuana. Officer Olson observed the apparent drug transaction between the two men in Young's car and a pedestrian. Olson directed his patrol car, with lights flashing, at the participants in the attempt to apprehend them. The pedestrian fled on foot, and Young tried to drive away. Olson successfully blocked Young by pulling his patrol car in front of Young's car. Olson left his car and ordered Young and his passenger to exit theirs. Young apparently reached down to the seat or floorboard of his car and Olson, believing that Young had a gun, fired his own weapon. The shot was fatal."
 Id. at 1351. The Fifth Circuit held that Mrs. Young could not recover under Sec. 1983, stating:
 "If Young's movements gave Olson cause to believe that there was a threat of serious physical harm, Olson's use of deadly force was not a constitutional violation.... The only fault found against Olson was his negligence in creating a situation where the danger of such a mistake would exist. We hold that no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts."
 Id. at 1353 (emphasis added). Like the officer in Young, Berry believed the occupants of the car he stopped had recently committed a crime ("stick-up") and were thus armed. Similarly, Berry stopped his car in front of the black Cadillac and approached the car from the front and observed the driver make a furtive movement with his hand into his coat (after not complying with Berry's command to raise his hands) in an area within the car (below the window frame and at seat level) so as Berry could not see exactly what the driver was doing. Thus Officer Berry had reasonable cause to believe that the use of deadly force was necessary. Rather than being in conflict with the well-reasoned decision of the Fifth Circuit, this court should follow that circuit's holding "[t]hat no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." Id. (emphasis added).
 In Davis v. Freels, 583 F.2d 337 (7th Cir.1978), Joseph Freels, a Chicago Police officer, was sued under 42 U.S.C. Sec. 1983 by Wallace Davis after Freels shot him in the back. The facts in Davis establish that Officer Freels and his partner believed Davis and another individual were wanted in connection with a shooting incident. The police officers confronted Davis and his companion and ordered the two men to walk over and place their hands on a car. Officer Freels testified that as Davis turned to put his hands on the car that he [Officer Freels] "saw a sudden movement with his [Davis'] right elbow in a backward direction." In response to this movement, Officer Freels fired his revolver which he had previously drawn as a precautionary measure. This court upheld the jury's verdict that Davis was not deprived of any rights under 42 U.S.C. Sec. 1983 and quoted with approval from 6 Am.Jur.2d Assault and Battery, Sec. 161 at 135 (1963):
 "In a civil action for assault, the defendant's belief that the plaintiff intended to do him bodily harm cannot support a plea of self-defense unless it was such a belief as a reasonable person of average prudence would have entertained under similar circumstances. It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self-defense at the time involved reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken. In forming such reasonable belief a person may act upon appearances. In other words, it is sufficient that the danger was reasonably apparent. [Footnotes omitted.]"
 Id. at 341 (emphasis added). In the instant case, after the shooting it was found that Sherrod was unarmed. Officer Berry resorted to self defense because based on the circumstances, it was reasonably apparent that he and his partner were in imminent danger of great bodily harm or death at the moment Berry observed Sherrod make a quick movement with his hand into his coat. Based on the facts Berry had at the time he approached the car that: (1) Sherrod was an occupant in a car carrying a suspect whom the officer had reason to believe was armed and involved in a "stick-up" which occurred moments before, and (2) Berry knew the suspect had a history of assaultive criminal activity, (3) he was required to repeat three separate and distinct orders for the occupants to comply with the command "to raise your hands." Thus, considering all the information Berry had as he approached the Cadillac, Berry reasonably believed his life and the life of his partner were in imminent danger and acted accordingly at the moment Sherrod made a rapid movement with his hand into his coat. At this time, it was impossible for Berry to determine whether Sherrod was armed. I find it inconceivable that it could be held under these circumstances that imminent bodily harm or death was not reasonably apparent so as to justify Berry's belief that a resort to self defense was necessary to protect himself and his partner just as other courts have ruled that the self defense of the officers in Davis and Young was justified. Thus, the admission of evidence that Sherrod was unarmed was extremely prejudicial to the defendants' case and should have been excluded since any probative value it might have had is clearly and
 "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."
 and its admission was in direct contradiction of the rules of evidence. Fed.R.Evid. 403.
 The district court attempted to justify the admission of the evidence that Sherrod was unarmed because "Had plaintiff been prevented from introducing this evidence, the record would have been such that the jury would have been left to speculate on whether Berry was justified in thinking that the claimed movement by Sherrod posed a danger to the police officer. This would not have been fair." Sherrod v. Berry, No. 80 C 4117, Mem.Op. at 38 (N.D.Ill. Nov. 15, 1985). This statement and faulty reasoning when viewed in its most favorable light is not only unfair to the defendants but above all is an improper recitation of the law. Fairness to all litigants is of paramount importance in a trial. I fail to understand the trial court's reasoning and the Majority's approval of giving the jury knowledge of facts (Sherrod was unarmed) that the defendant Berry did not have the benefit of having at the fatal moment when he made the critical decision to fire his revolver in self defense and protection of himself and his partner. The Majority, in approving of the admission of this evidence, overlooks the fact that the issue is whether Officer Berry acted reasonably based on the totality of the information he possessed when he stopped the car, approached the occupants and fired his revolver in response to what he believed was a life-threatening movement endangering himself and his partner. We have stated that "It is only when the probative value of the evidence is substantially outweighed by the likelihood that the evidence will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented ... that Rule 403 requires its exclusion." United States v. Medina, 755 F.2d 1269, 1274 (7th Cir.1985). The evidence that Sherrod was unarmed suggested to the jury that the fact that Sherrod was not armed was relevant to the jury's deliberations in assessing whether Berry reasonably believed that Sherrod was reaching for a weapon when he quickly put his hand inside his coat. Shifting the focus of the inquiry to the fact that Sherrod was unarmed "induc[ed] the jury to decide the case on an improper basis" and therefore the evidence that Sherrod was unarmed should have been excluded under Rule 403. United States v. Medina, 755 F.2d at 1274. Had Officer Berry claimed he had seen a gun on Sherrod, the evidence that Sherrod was not armed would have been relevant, but Berry testifying truthfully never once claimed he saw a gun. As previously noted, the Supreme Court has "[s]pecifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). "Indeed, it appears 'that a significant percentage of murders of police officers occurs when the officers are making traffic stops.' " Id. (quoting United States v. Robinson, 414 U.S. 218, 234 n. 5, 94 S.Ct. 467, 476 n. 5, 38 L.Ed.2d 427 (1973)). "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." Terry v. Ohio, 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968). I would hold based upon the record that the trial judge abused his discretion and committed prejudicial error of a grievous nature allowing submission of evidence to the jury of the fact that after the shooting it was discovered that Sherrod was unarmed since this evidence was irrelevant to determining whether Officer Berry acted reasonably. It is clear, the fact that Sherrod was unarmed does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Fed.R.Evid. 401, 402. In addition to the evidence being clearly irrelevant to determining whether Berry acted reasonably, the admission of this evidence was additionally prejudicial to Officer Berry since it gave information to the jury that the officer did not possess when he fired at Sherrod in a situation in which he believed his action was justified, and his belief is supported by case law, in the protection of his life and that of his partner. Thus, the district court clearly abused its discretion in admitting this evidence and this court should not allow the jury's verdict to stand, based as it is on prejudicial and improper evidence.
 
 
 B
 Improper Jury Instructions and Admission of Evidence of Berry's Alleged Misconduct
 
 
 [1]
 Improper Jury Instruction Regarding Officer Berry's Alleged Prior Misconduct
 The plaintiff introduced evidence of three incidents of alleged bad judgment in Berry's performance of his police duties that occurred prior to the shooting of Sherrod. All three incidents were also admitted in evidence against the Chief and the City of Joliet to demonstrate that prior to Berry's action in the Sherrod incident, the Chief and the City had knowledge of Berry's propensity to use excessive force but did nothing to prevent him from using excessive force. According to the district court's statement at the time this evidence was introduced, only one of these incidents was intended to be admitted against Officer Berry as evidence that Berry should have known that the use of deadly force against Sherrod was not proper under the circumstances. Although the district court mentioned the limited purpose for which the evidence of these three incidents could be used at the time the evidence was admitted, the district court failed to reiterate, recite and instruct the jury on the limited use of this evidence and instead suggested to the jury that in fact no such limits as to the use of the evidence existed at the time he gave the final oral and written instructions to the jury. The only incident the judge supposedly intended to be admitted against Berry, the Waddell case, involved circumstances entirely separate, distinct and far removed in similarity from the facts of the Sherrod case. Thus the admission of the facts of the Waddell incident allowed the jury to judge the reasonableness of Berry's conduct in the Sherrod case on the basis of Berry's conduct in a situation which presented significantly less danger to Officer Berry than the imminent danger to Berry's life which objectively existed when he approached the car driven by Sherrod. Because of the district court's failure to give the proper limiting instruction either orally or written in his charge to the jury concerning the prior incidents and because the introduction of an incident of prior misconduct against Berry that is clearly distinguishable from the facts of this case substantially prejudiced Officer Berry's defense, and thereby the defense of the Chief and the City whose liability was derivative of Berry's liability, I am convinced this case should be remanded for a new trial.
 The plaintiff alleged Officer Berry was involved in three incidents of police misconduct: Bradley, Thompson, and Waddell. The Bradley incident was a domestic squabble involving Berry, his sister, and her future husband. Allegedly, Officer Berry pulled a gun on Bradley, but he denied the accusation. Even though Bradley did not file a complaint, the police department conducted an investigation and based on the findings of the investigation, Chief Breen suspended Berry for ten days. I fail to understand how the Majority concludes that "[n]o serious sanctions were ever imposed on Berry as a result of these other incidents [Bradley, Thompson, and Waddell]...." A ten-day suspension is a serious sanction, and when considered along with the reprimand Berry received as a result of the Waddell incident (another incident the Majority claims the Chief failed to take action in) clearly establishes, contrary to the Majority's assertion, that Chief Breen took appropriate action to curb whatever aggressiveness Berry had previously exhibited.
 In Thompson, Berry used his official police-issued flashlight to subdue Thompson who was attacking him with his fists, his elbows, and his feet. After Thompson filed a complaint the matter was investigated by the Fire and Police Commission, a duly authorized body of inquiry. Because Chief Breen did not want to interfere with the Commission's inquiry, the Chief declined to take any independent action at that time; subsequently the Commission exonerated Berry for his conduct in the Thompson case.
 In the Waddell incident, Officer Berry and another officer suspected that the occupants of a car suspiciously circling a gas station late at night might be planning or had just committed a burglary. Officer Berry took off in pursuit of the car and after a chase, Waddell rammed his car into the passenger side of Officer Berry's squad car. At this point, the suspect (Waddell) jumped from his car, hit the ground in a crouched position and thrust[9] his hand into his coat as if reaching for a weapon. Officer Berry shot at Waddell out of fear of bodily harm. Chief Breen reprimanded Berry stating that Waddell's actions did warrant suspicion, but not the use of deadly force since unlike the Sherrod case the arresting officers had no prior knowledge upon which to base a reasonable suspicion that either of the car's occupants were armed.
 When testimony concerning the Bradley and Thompson incidents was received in evidence, the district court stated to the jury:
 "[Bradley] Ladies and gentlemen of the jury, this often happens that a witness is called and the testimony of that witness is admissible only as against one of the defendants. Notice that in this case there are three defendants: Officer Berry, Chief Breen, and the City of Joliet.
 It seems to be agreed by the parties that this witness' testimony only bears on the liability of the City of Joliet."
 * * *
 * * *
 "[Thompson] Ladies and gentlemen of the jury, bear in mind that the questions that Mr. Horwitz is asking Mr. Berry about this incident that he has just described involving a Mr. Thompson is evidence only admissible against Chief Breen and the City of Joliet. And later on when you hear the argument and I instruct you on the law, you will be able to understand the limitation on this evidence."
 But one week and 1200 pages of testimony later, the district court stated in its final instructions to the jury:
 "Evidence as to any misconduct by Willie Berry prior to the killing of Ronald Sherrod can be considered only for the purpose of determining liability on the part of Fred Breen and/or the City of Joliet based on any notice or knowledge on their part as to any propensity of Willie Berry towards the use of excessive force.
 However, for the purpose of determining whether Willie Berry reasonably believed that the use of deadly force was necessary to prevent death or great bodily harm to himself or another under circumstances of this case, you may consider any prior reprimands Willie Berry may have received with regards to his use of force before December 8, 1979.
 The district court's fatally prejudicial final written and oral instructions blatantly contradict the previous limiting statement the court made when the Thompson and Bradley evidence was introduced and suggested to the jury that it could consider all three of the prior incidents involving Officer Berry in determining whether Berry acted reasonably when he shot Sherrod. Since the Thompson and Bradley incidents were not similar in that they were not life-threatening situations, they were not in any way relevant to determining whether Berry acted reasonably in view of the life-threatening circumstances presented in the Sherrod matter, and in the absence of a proper limiting instruction were extremely prejudicial to Berry's defense since they suggested that Berry used excessive force in the Sherrod case despite circumstances far removed from those Berry encountered in Bradley and Thompson. The Majority admits the unduly prejudicial effect of this evidence on Berry, but somehow chooses to ignore the contradictory instructions preferring instead to conclude somehow that despite the nature of the confusing and misleading final instruction to the contrary, the jury did not use the Bradley and Thompson evidence against Berry:
 "While this evidence [of Berry's alleged misconduct] was admittedly prejudicial with respect to Berry, it was highly probative as to the existence of a municipal policy of Joliet to maintain on its police force officers who consistently used excessive force in discharging their official duties the touchstone of municipal and supervisory liability under Sec. 1983. The trial court admitted the evidence of the prior incidents only against Chief Breen and the City to show that they had knowledge of Berry's prior use of excessive force and failed to take adequate corrective action. The incidents were never proved against Berry."
 (Emphasis added). How the Majority came to this conclusion I fail to understand. But the district court's misleading and erroneous instructions effectively negated any effect whatsoever the court's initial intended limiting statement may have had after a week of additional testimony and evidence since the instruction clearly suggested to the jury that all three incidents could be used against the Chief, the City and Berry:
 "... for the purpose of determining whether Willie Berry reasonably believed the use of deadly force was necessary ... you may consider any prior reprimands Willie Berry may have received with regards to his use of force...."
 Since the district court failed to identify the incidents that involved reprimands from incidents where other disciplinary or investigative action was taken in response to acts of Berry, it was impossible for the jury to distinguish between the incident (Waddell) allegedly relevant to considering the reasonableness of Berry's conduct in the Sherrod case. Because the Bradley and Thompson incidents did not involve life-threatening situations they were not relevant to determining the reasonableness of Berry's conduct in the Sherrod case where Officer Berry was presented with an imminent life-threatening situation and the district court's instruction permitting the jury to reflect upon Thompson and Bradley against Berry substantially prejudiced Berry,[10] as well as the City of Joliet. Therefore the trial court's failure to properly instruct the jury both orally and in writing to limit the admission of the evidence concerning Berry's conduct on three prior occasions requires this court to remand the case for a new trial with proper instructions as to the limited purpose for which the prior incidents involving Berry could be used.
 The trial judge directed the jury to consider the evidence of the three incidents of alleged misconduct (Thompson, Bradley and Waddell) on the part of Officer Berry against the City of Joliet and Chief Breen "since it allegedly established that they had knowledge of Berry's prior use of excessive force and failed to take any corrective action." The Majority, despite the evidence in the record to the contrary, accepts the district court's assertion that the Thompson, Bradley, and Waddell incidents established that the Chief and the City failed to take any corrective action concerning Berry's prior use of force in carrying out his responsibilities as a police officer. The record, however, clearly establishes that the Chief did in fact take disciplinary action against Berry after the Bradley and Waddell incidents. After the Bradley incident, Breen suspended Berry without pay[11] for ten days. After the Waddell incident, Breen officially reprimanded Berry for using unnecessary force. Chief Breen had no reason to discipline Berry after the Thompson incident since the Fire and Police Commission exonerated Berry of any wrongdoing. Thus, Chief Breen did all that could reasonably be expected of him to eliminate any misconception Officer Berry may have had as to the proper amount of force he was entitled to exercise in the various situations he confronted. Therefore, I fail to understand how the district court, and now the Majority, could conclude that the evidence introduced established that Chief Breen "failed to take any corrective action" as to the amount of force Berry had used in the other incidents.
 Finally, the Majority notes that an objective standard must be used to determine "whether a reasonable person would conclude that deadly force was necessary to prevent imminent death or great bodily harm to himself or another." By allowing the jury to consider any prior reprimands against Officer Berry "for the purpose of determining whether Willie Berry reasonably believed that the use of deadly force was necessary to prevent death or great bodily harm to himself or another under the circumstances of this case," the district court erroneously and prejudicially substituted a subjective test for an objective test. The proper objective test is whether Officer Berry acted reasonably based on all of the knowledge he possessed when he approached the occupants of the Cadillac and fired his revolver. Allowing the Waddell evidence to be admitted against Berry suggested and handed to the jury a guided roadmap that it could determine the reasonableness of Berry's conduct in Sherrod on the basis of the reasonableness of his conduct in Waddell, where Chief Breen had previously determined that Berry had used unnecessary force since Berry had no reason to believe the suspects were armed. Thus, the jury could only conclude that since Chief Breen determined that Berry's use of force in Waddell was unnecessary, his use of force in Sherrod was likewise unnecessary contrary to Chief Breen's findings and instructions and despite the fact that the danger that confronted Berry in the Sherrod incident was imminent, substantially more grave and life-threatening than the danger presented in Waddell where Berry had no prior information that would reasonably have caused him to believe that either Waddell or his companion were armed. Chief Breen testified to the considerable differences between the Waddell incident and the Sherrod case; in Waddell the suspects had not defied an order to raise their hands since no order was given, nor had any assaultive crime been reported that would cause Berry and/or a reasonable person to believe the suspects were armed. In Sherrod, Breen explained that Berry had information that a robbery ("stick-up") had occurred which provided a reasonable basis for Berry's belief that the occupants of the car might be armed.
 Thus, the situation Berry encountered when he approached Sherrod's vehicle was significantly more violent and dangerous than the situation he faced in Waddell and the reasonableness of Berry's conduct in Sherrod must be considered in light of the specific danger Berry believed existed based on the events immediately prior to his approaching the car driven by Sherrod: (1) Officer Berry had received information that led him to believe that there was at least one armed occupant of the Cadillac who had just been involved in a "stick-up" (armed robbery), a violent assaultive felonious crime; in Waddell, Officer Berry had only reason to suspect that the occupants of the Waddell vehicle might have been involved in or were planning a burglary--a non-assaultive crime; (2) during the Sherrod encounter, Officer Berry was required to give three separate commands before the suspects raised their hands, further arousing his suspicion as to the potential danger he and his partner were facing; in Waddell he never gave a command to Waddell and the other occupant to raise their hands because he had no prior information to suspect that either suspect might be armed; (3) when Sherrod made a quick movement into his coat, Officer Berry, believing it to be a life-threatening movement to himself and his partner, fired his revolver. The district court's instructions improperly allowed the jury to consider Berry's reprimand in Waddell (a dissimilar fact situation). The reprimand the jury was allowed to consider in the Waddell case which was so far removed from the circumstances confronting Berry in Sherrod was neither probative nor proper, but was a guided roadmap to liability and extremely prejudicial in weighing whether or not Officer Berry reasonably believed that the use of his weapon was necessary. Therefore, this court should remand the case for a new trial.
 
 
 [2]
 Improper Admission of Evidence Concerning the Waddell Incident in Contradiction of Rule 404(b) of the Federal Rules of Evidence
 The Majority improperly, and without citing any authority, upholds the admission of the Waddell incident against Berry because "it showed a consistent pattern of conduct." I am perplexed to understand how a single incident with substantially different circumstances can be used to demonstrate a "consistent pattern of conduct." It is similar to stating that an implant of a rod in a fractured femur bone is similar to a heart transplant since they are both invasions of the body cavity and are surgical procedures. The United States District Court in United States v. Gilman, 341 F.Supp. 891, 906 (S.D.N.Y.1972) stated: "an 'isolated or accidental or peculiar event' constituting a single act of discrimination does not rise to the level of the 'pattern or practice' requisite to federal court action...." The Ninth Circuit, in an employment discrimination case, stated "[i]t takes more than one unlawful practice to constitute a 'pattern or practice' of employment discrimination." United States v. Fresno Unified School District, 592 F.2d 1088, 1095 n. 5 (9th Cir.1979) (emphasis added). No matter how one views the Waddell evidence, whatever slight probative value the evidence may have had was substantially outweighed by its prejudicial effect on Officer Berry and its admission is violative of Rule 404(b) of the Federal Rules of Evidence:
 (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.
 The notes of the advisory committee state that "[e]vidence of other acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it." I fail to see how the Waddell incident, one single incident dissimilar in nature and circumstances to the Sherrod case, can establish a "consistent pattern of conduct" on the part of Officer Berry. The trial judge committed error in admitting evidence regarding the Waddell incident since it was irrelevant to test whether the officer acted reasonably based on the collective knowledge and information he possessed when he fired his gun in response to what he perceived to be a life-threatening movement by one of two suspects in a car, one of whom he believed to be an armed felon. It is evident the evidence was introduced in an attempt to demonstrate bad character on the part of Officer Berry in direct contravention of Rule 404(b) of the Federal Rules of Evidence.
 The First Circuit upheld the district court's refusal to admit inflammatory evidence in a similar case. Tigges v. Cataldo, 611 F.2d 936 (1st Cir.1979). In Tigges, the plaintiff brought a 42 U.S.C. Sec. 1983 action against two police officers (Cataldo and another officer) alleging police brutality. At the trial, the district court barred the plaintiff from cross-examining the defendant Cataldo with respect to certain interrogatories that had previously been addressed to Cataldo in discovery. The interrogatories of Cataldo dealt with the administrative disciplinary procedures in the defendant's police department. The plaintiff, Tigges, claimed that Cataldo's answers were intentionally misleading since Cataldo had at one time been the subject of disciplinary action in another incident. The First Circuit upheld the district court's refusal to allow the desired cross-examination noting that Tigges "[w]as not entitled to show by extrinsic evidence that Cataldo had been disciplined in 1971. Fed.R.Evid. 404(b).... Evidence of other, unrelated episodes was material only in the impermissible sense of showing a bad character from which to infer a propensity to commit the alleged wrong." Id. at 938. The only purpose of the "unrelated episode" involving Waddell, as in Cataldo, was an effort to demonstrate bad character on the part of Officer Berry "from which to infer a propensity to commit the alleged wrong" in direct contravention of Rule 404(b) of the Federal Rules of Evidence.
 I find it impossible to understand how one incident could be used to demonstrate a "consistent pattern of conduct." Like the trial court, the Majority apparently fails to differentiate how the evidence of the incidents of Berry's alleged police misconduct could be used against the respective defendants since it allows one incident substantially dissimilar to be used in establishing a consistent pattern of conduct. That a single incident (Waddell) was used to establish a consistent pattern of conduct is appalling of itself, but added thereto, the Waddell incident involved a significantly different factual situation and thus makes its admission impossible to understand if the rules of evidence and fair play are to be followed in a search for the truth. Furthermore, the evidence was nothing more than a deliberate attempt on the part of the plaintiff to influence the jury to find that Officer Berry had a propensity to use excessive force in direct contravention of Rule 404(b) and should have been excluded since Rule 404(b) prohibits the admission of "Evidence of other acts ... to prove the character of a person in order to show that he acted in conformity therewith." The trial court's failure to respect the requirements of Fed.R.Evid. 404(b), and the Majority's failure to recognize and correct the district court's improper reception of evidence is improper.
 C. The District Court's Improper Jury Instruction Regarding the Disciplining of Officer Berry
 The trial judge refused to give the defendants instruction no. 31 setting forth that the police chief and City of Joliet's failure to discipline Officer Berry for the shooting of Sherrod was insufficient by itself to show that they maintained a policy of excessive force:
 "A showing that the City of Joliet or Frederick Breen failed to discipline Willie Berry for the shooting of Ronald Sherrod, standing alone is insufficient to show that either the City of Joliet or Frederick Breen maintained a policy of using excessive force."
 Despite the fact that Berry was reprimanded and/or disciplined for the Waddell and Bradley incidents, the Majority for some reason upholds the judge's ruling by stating "this instruction was refused on the ground that it was argumentative because it omitted to mention their liability for failing to discipline Berry as well as other Joliet police officers in other instances of excessive force" when the record as to the disciplining of Berry recounts most eloquently to the contrary. As I have noted, the record clearly establishes that Chief Breen did discipline Officer Berry: (1) in Waddell, Chief Breen reprimanded Berry, (2) in Bradley, Berry was suspended for ten days. In Thompson, Berry was exonerated by the Board of Fire and Police Commissioners. I wonder, since when is a reprimand in one instance and a ten-day suspension in another instance considered as a failure to take "corrective action"? If the Chief had dismissed Officer Berry in either the Bradley or Waddell incident, it is obvious that he and the City would have been subjected to litigation for discharge without proper cause and properly so.
 Either the Majority has not examined the same record I have reviewed, or simply refuses to acknowledge the fact that Chief Breen disciplined and/or reprimanded Berry in the other instances of alleged misconduct. Individually one may or may not agree with the severity or type of discipline Chief Breen meted out to Berry in the alleged instances of misconduct but it is not for us to second guess Chief Breen on review. Nonetheless, Chief Breen did discipline and/or reprimand Berry and in the interest of fairness and non-prejudicial jury instructions, this should have been noted and pointed out and made clear to the jury in the instructions in hopes of aiding the jury in coming to a fair, just and impartial decision. See, e.g., Spesco, Inc. v. General Elec. Co., 719 F.2d 233, 239 (7th Cir.1983) ("jury instructions are designed to clarify issues for the jury and to educate the jury about what factors are probative on those issues.")
 D. The District Court's Improper Jury Instruction Equating Deliberate Indifference and Gross Negligence
 The Majority also ignores the district court's confusing and misleading instruction concerning the degree of culpability on the part of the City of Joliet that the plaintiff was required to establish in order to find the City liable. The trial judge instructed the jury that they could find the defendant city liable on the basis of gross negligence, or, in the alternative, deliberate indifference:
 "If you find, from a preponderance of the evidence that the City of Joliet, on and prior to December 8, 1979, established and maintained a policy or custom which evidenced deliberate indifference or gross negligence in the training, supervision, and/or discipline of its police officers and such policy or custom was the proximate cause of Ronald Sherrod's death, then you must find that the City of Joliet, without due process of law, deprived Ronald Sherrod of liberty secured and protected to him by the Constitution and laws of the United States, and in such a case you will return a verdict for the plaintiff."
 (Emphasis added).
 In order to establish municipal liability under section 1983, a plaintiff must prove that a causal relationship exists between the act which allegedly deprived the plaintiff of a constitutional right and the alleged misconduct on the part of the state or municipality that gave rise to the wrongful act. However, the degree of culpability on the part of the city or municipality that the plaintiff must establish on the part of the municipality varies depending on how far removed the alleged misconduct of the city is from the act of the officer that gave rise to the Sec. 1983 claim. Thus, where the City's misconduct is alleged to have been in the training of its police officers, four members of the Supreme Court have recognized that the attenuated causal connection between the training and subsequent acts of the officer requires a degree of culpability on the part of the city that exceeds negligence:
 "Similarly, a jury should be permitted to find that the municipality's inadequate training 'caused' the plaintiff's injury only if the inadequacy of the training amounts to deliberate indifference or reckless disregard for the consequences. Negligence in training alone is not sufficient to satisfy the causation requirement of Sec. 1983."
 City of Springfield v. Kibbe, --- U.S. ----, 107 S.Ct. 1114, 1121, 94 L.Ed.2d 293 (1987). In Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986), the Supreme Court concluded "[t]hat the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." (Emphasis in original to negligent) (emphasis added to a). In Daniels, the petitioner brought a Sec. 1983 action against a deputy sheriff alleging that while an inmate at the city jail in Richmond, Virginia, he was injured when he slipped on a pillow negligently left on the stairs by the deputy sheriff stationed at the jail. In rejecting the petitioner's claim, the Supreme Court stated that "[l]ack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." Id. at 665.
 In the instant case, the district court instructed the jury that gross negligence or deliberate indifference on the part of the City of Joliet was sufficient to establish the City's liability under Sec. 1983. However, by using gross negligence and deliberate indifference interchangeably, the trial judge in effect instructed the jury that it could find the city liable if the jury determined the City had been grossly inadvertent (i.e., gross negligence) in training the officers or had deliberately or consciously provided inadequate training. These two standards are contradictory of each other and thus cannot under any circumstances be used as alternatives for each other. As Prosser explains:
 "most courts consider that gross negligence falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind. There is, in short, no generally accepted meaning; but the probability is, when the phrase is used, that it signifies more than ordinary inadvertence or inattention, but less perhaps than conscious indifference to the consequences."
 Prosser and Keeton Handbook on Torts 212 (5th ed. 1984) (footnotes omitted). Deliberate indifference, on the other hand, clearly connotes conduct that is conscious or intentional, and thus different in kind from conduct classified as negligent or grossly negligent:
 "In defining the concept of deliberate indifference, it is important to recognize that although it is closely associated with gross negligence, there is a significant distinction. See Doe v. New York City Department of Social Services, 649 F.2d at 143. In essence, gross negligence is the breach of reasonable standards of conduct posing obvious dangers to others while deliberate indifference involves a knowing lack of regard or concern for the safety of others. In the context of governmental care or custody, deliberate indifference involves the intentional failure of governmental officials assigned to the protection of an individual to concern themselves with that individual's welfare. Orpiano v. Johnson, 632 F.2d at 1101. A governmental official may act with gross negligence toward an individual placed in his care by inadvertently exposing him to obvious and extreme dangers. However, unless that official was actually aware of the dangers involved and failed to act to provide reasonable protection due to a conscious lack of concern for the individual's safety, the official did not act with deliberate indifference."
 Jensen v. Conrad, 570 F.Supp. 114, 122 (D.S.C.1983) (footnote omitted). As the Second Circuit noted in Doe v. New York City Dept. of Social Services, 649 F.2d 134, 143 (2d Cir.1981) "[T]here can be instances where glaring negligence may not constitute deliberate indffference...." The Supreme Court has expressly acknowledged the difference between negligent conduct--regardless of the degree of negligence--and conduct that is deliberate, reckless or intentional:
 "The element of culpability which characterizes all negligence is, in gross negligence, magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is manifestly a smaller amount of watchfulness and circumspection than the circumstances require of a prudent man. But it falls short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong. Ordinary and gross negligence differ in degree of inattention, while both differ in kind from wilful and intentional conduct which is or ought to be known to have a tendency to injure."
 Conway v. O'Brien, 312 U.S. 492, 495, 61 S.Ct. 634, 636, 85 L.Ed. 969 (1941). Thus, it was error for the trial court to instruct the jury that gross negligence or deliberate indifference meant the same thing and that either was sufficient to support a finding that the City of Joliet was liable under Sec. 1983 for the death of Ronald Sherrod. Not only are the two terms mutually exclusive of each other--inadvertent (i.e., negligence) conduct by its very definition cannot amount to intentional or deliberate conduct--but the jury instruction allowed the jurors to impose liability on the basis of a degree of culpability significantly less than that required by four members of the Supreme Court to establish the necessary causal relationship in a Sec. 1983 action between the act of the officer that allegedly deprived the plaintiff of his constitutional right, and the alleged wrongdoing on the part of the city responsible for the acts of the officer. See Kibbe, supra. The Majority without citation to any part of the record states "the record clearly indicates that the defendants acted recklessly and with gross negligence." I am at a loss to comprehend how the Majority can make such a sweeping statement in view of the record before us and of the district court's erroneous instruction as to the municipality's liability. I fail to understand how the Majority can allow the verdict against the City of Joliet to stand, premised as it is on but another erroneous and misleading instruction as to the degree of culpability the plaintiff must establish on the part of the City to recover under Sec. 1983.
 E. Improper Admission of Evidence of a Lawsuit that Occurred After the Events in the Instant Case
 Further, I am at a loss to discern how the Majority upholds the district court's admission of testimony of an incident that occurred one month after the shooting of Ronald Sherrod (the Bucciarelli lawsuit). This evidence clearly should not have been admitted since the event took place one month after the shooting of Ronald Sherrod and thus is wholly irrelevant and prejudicial to deciding whether the city and chief of police maintained an improper policy regarding the use of force at the time of Sherrod's death. The Majority claims that the defendants "never specifically challenged its [the Bucciarelli case] admission on the ground seized upon by the dissent" concluding that "[t]he dissent cannot urge reversal on a ground that has been waived." But as the Majority acknowledges, the defendants objected to the admission of the Bucciarelli case on the ground that "it 'had no probative value whatsoever regarding any issue in this lawsuit' " (quoting defendants' brief). Since probative value is an element of relevancy, see e.g., McCormick, McCormick on Evidence Sec. 185 (3rd ed. 1984), I fail to understand how the defendants waived relevancy as a basis for objecting to the admission of the Bucciarelli case simply by framing their argument in terms of the probative value of the Bucciarelli case. I note the Majority cites no case law in support of the trial court's reception of evidence on this issue, nor does Lexis or Westlaw reveal any known authority that supports the introduction of such evidence.
 The evidence of the Bucciarelli lawsuit was offered to prove that Breen and the City had knowledge of the propensity to use excessive force against citizens. In Magayanes v. Terrance, 739 F.2d 1131 (7th Cir.1983), Magayanes brought a Sec. 1983 suit in this same circuit against the City of Chicago and four Chicago police officers claiming, among other things, that the city used a defectively designed squadrol to carry him to jail when he was arrested in November, 1979. The trial judge ruling on the defendant's motion in limine refused to allow a witness named Franklin to testify that he had been injured while he was transported as a prisoner in a squadrol in June, 1980 since the testimony would have been irrelevant and prejudicial. This court upheld the district court's refusal to admit the evidence stating:
 "The testimony of Franklin would not have been relevant. The use of the squadrol for Magayanes was in November, 1979; the use of the squadrol for Franklin was in June, 1980. The City thus could not have had, at the time of the arrest of Magayanes, any notice from the Franklin incident that the design of the squadrol might cause injury."
 Id. at 1136. As in Magayanes, the evidence of the Bucciarelli lawsuit should have been ruled inadmissible since the events that gave rise to the lawsuit occurred one month after the shooting of Sherrod and thus could not have put the city on notice that its officers have a propensity to use excessive force against citizens.
 The defendants in their brief argue that admitting evidence of the Bucciarelli incident and lawsuit allowed the jury to infer "that there was some merit to the assertions that the Bucciarelli incident involved excessive force" when there was no evidence presented that the actions of any Joliet police officer caused the death of the decedent. Since when can you admit evidence of subsequent acts in a lawsuit of this nature that have taken place after the event giving rise to the lawsuit? An incident that occurred more than one month after the events in the instant case should not have been received into evidence. The Majority relies on the Fifth Circuit's opinion in Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir.1985), to support its assertion that evidence of events occurring after the act which forms the basis of a Sec. 1983 action is properly admissible to "prove preexisting disposition or policy." However, Grandstaff presented a unique situation where the plaintiff was unable to produce any evidence of conduct occurring before the events underlying the lawsuit that would establish a "disposition or policy" on the part of the defendants. But the court in Grandstaff only permitted the plaintiff to introduce evidence concerning the police chief's (and City's) failure to take any disciplinary action against the police officers allegedly involved in the lawsuit. The Bucciarelli case did not establish that the City of Joliet or Chief Breen condoned Berry's conduct by not taking any disciplinary action; instead, the introduction of the Bucciarelli evidence in this case presented the jury with highly prejudicial evidence--prejudicial because it was not necessary when establishing a "disposition or policy" on the part of the defendants, and because the involvement of the Joliet Police Department was marginal at best. The Bucciarelli incident occurred outside the jurisdiction of the Joliet Police Department and involved another police department jurisdictional area (Rockdale) and a Will County sheriff. The Joliet police responded to a call for assistance from two Rockdale police officers, and the injury to Bucciarelli was inflicted by a Will County sheriff while two Joliet police officers were attempting to help the Rockdale officers subdue the victim. Thus, the admission of the Bucciarelli case against the City of Joliet and Chief Breen did not establish that the defendants condoned Berry's action from which the jury could infer a "disposition or policy" as did the admission of the after the fact conduct in Grandstaff.
 III
 As I noted earlier in this dissent, law enforcement officers perform the vital function of preserving peace in our society. Officer Berry was found by the jury to have improperly used force in shooting Ronald Sherrod. The district court judge made several eggregious evidentiary decisions any one of which would have been sufficient to require reversal but when considered collectively, unquestionably prejudiced Officer Berry and the other defendants:
 (1) the jury's receipt of evidence that Sherrod was unarmed thus allowing the jury in its effort to measure and determine the reasonableness of Officer Berry's conduct with information that Officer Berry did not have when he reacted to what he believed was a life-threatening movement,
 (2) allowing testimony regarding the Waddell incident and the reprimand in Waddell to demonstrate a consistent pattern of excessive force on the part of Officer Berry in shooting Sherrod when the factual situation in Waddell was markedly different from what occurred in Sherrod, and
 (3) the receipt of testimony regarding the Bucciarelli incident, an event that occurred one month after the events that gave rise to the instant action.
 The cumulative effect of all of these confusing and erroneous rulings undoubtedly permeated and prejudiced the jury verdict. These evidentiary rulings combined with the trial judge's errors in instructing the jury:
 (1) that they could consider Berry's reprimand in Waddell for the purpose of determining whether Officer Berry reasonably believed "deadly force" was necessary to prevent death or great bodily harm to himself or another since the Waddell incident involved a dissimilar set of circumstances,(2) regarding how they could use the evidence surrounding Berry's alleged misconduct,
 (3) they could find the City of Joliet liable based on either gross negligence or deliberate indifference when the two theories of culpability are not interchangeable and are in fact mutually exclusive of each other and in contravention of City of Springfield v. Kibbe, --- U.S. ----, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) substantially prejudiced the defendants, and
 (4) finally, the trial judge improperly refused to include in its jury instructions that the defendants' failure to discipline Berry for shooting Ronald Sherrod was insufficient by itself to show that they maintained a policy of excessive force. For some reason unexplained in the record, the trial judge erroneously refused to give the instruction on his mistaken belief that Berry had not been disciplined in prior alleged incidents of police misconduct, when in fact, he had received a reprimand in Waddell, and a ten-day suspension in Bradley. He was exonerated by the Board of Fire and Police Commissioners in Thompson.
 The crucial issue in this case is whether Officer Berry acted reasonably in light of the totality of the information he possessed when he fired his gun: (1) Sherrod was an occupant in a car carrying a suspect he had reason to believe was armed and involved in a "stick-up" which occurred moments before and whom Berry knew to have a history of assaultive criminal activity; (2) it required three separate and distinct commands from Officer Berry before the occupants, including Sherrod, complied with the officer's order to "raise their hands;" and (3) Sherrod made a rapid movement with his hand into his coat at the very moment Officer Berry approached the car. Sherrod's quick movement of his hand into his coat combined with the other information, facts and circumstances gave Officer Berry reasonable cause to believe that there was a threat of imminent great bodily harm or death to himself or his partner, thus his use of deadly force can not be considered a constitutional violation. Cf. Young v. City of Killeen, Tex., 775 F.2d 1349, 1355 (5th Cir.1985). This court has previously held that a police officer may act on appearances stating: "It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self-defense at the time involved reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken." Freels, 583 F.2d at 341.
 I agree with the Fifth Circuit's holding in Young: "[t]hat no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." 775 F.2d at 1353 (emphasis added). The district court's erroneous evidentiary rulings and instructions to the jury overwhelmingly prejudiced Officer Berry and the other defendants. The Supreme Court has recently stated in Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986) that:
 "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States, Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976), quoted in Parratt v. Taylor, 451 U.S., at 544, 101 S.Ct., at 1917."
 In view of this court's previous decision in Freels and the Fifth Circuit's decision in Young, the Majority's decision can only be interpreted as being in direct conflict with decisions like Young and Davis and thus sending a conflicting message as to what a law enforcement officer can and should do when faced with life-threatening actions with a suspected armed felon; I therefore dissent. In view of the multitude of prejudicial errors in the admission of evidence and the numerous and fatally misleading jury instructions, I would reverse the jury's verdict on Counts I and II and its award of $1,601,700 in damages and at the very least order a new trial on all issues.
 
 
 [1]
 The dissent makes much of the fact that Berry believed he was responding to a "stick-up" or armed robbery. It is important to note that none of the radio dispatches ever used the words "stick-up" or "armed robbery." Rather Berry testified that he inferred from the dispatches that there had been a "stick-up." Whether this was a reasonable inference to draw was a question of fact for the jury
 
 
 [2]
 The dissent emphasizes that it took three commands before Ronald and Gary Duckworth raised their hands in the air. It is not clear from the record how much time elapsed between each of these commands. Officer Klepfer testified that Berry was screaming at them to "get their motherfucking hands up" (Tr. 406-407). Moreover, Berry himself testified that Ronald and Gary were sitting "peacefully" in the car and gave no indication that they would offer any resistance at all (Tr. 502, 1203-1204)
 
 
 [3]
 The dissent recounts that Officer Klepfer testified that Sherrod made a "quick" movement with his hand into his coat and that there was no doubt in Klepfer's mind that when Ronald started to move, "he was going to reach for a weapon of some type." On cross-examination, however, Klepfer admitted that Ronald's movement was not "a sudden movement" and that "it wasn't as if someone were reaching for something of some type" (Tr. 1263-1265). Klepfer also testified that he did not feel any particular danger when he saw Ronald's hand move (Tr. 1280-1281)
 
 
 [4]
 In its discussion of this issue, the dissent cites two cases, Young v. City of Killeen, 775 F.2d 1349 (5th Cir.1985), and Davis v. Freels, 583 F.2d 337 (7th Cir.1978), neither of which discusses the admissibility of evidence regarding whether the victim of a police shooting was armed or unarmed. Nevertheless, the dissent claims that our treatment of the present case is in conflict with these cases. In Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, the Supreme Court held that a police officer may use deadly force to prevent the escape of an apparently unarmed suspected felon only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. Whether the officer has such probable cause is a question of fact, which the jury in this case answered in the negative. By contrast, in Young after a trial before the court, the district judge found that the defendant officer was justified in shooting the plaintiff as a result of the plaintiff's sudden movements but erroneously concluded that the officer had created a dangerous situation by his disregard of prudent police procedure and hence could not escape liability for the plaintiff's death. Similarly, in Davis, the jury found that the defendant possessed a reasonable belief that the plaintiff posed an imminent danger to him of death or bodily harm. The jury here simply did not find that "[Ronald's] movements gave [Berry] cause to believe that there was a threat of serious physical harm." Young, 775 F.2d at 1353
 
 
 [5]
 The dissent charges that by upholding a jury verdict finding that Berry did not have a reasonable belief that the use of deadly force against Ronald was necessary to prevent death or great bodily harm to himself or others, we are handcuffing law enforcement officers in their efforts to protect the public. We of course agree with the dissent that police officers perform a vital function in our society and often must perform this function in conditions of constant peril. Nevertheless, this fact does not give them license to engage in lawless behavior. As the Fifth Circuit aptly recognized in Grandstaff v. City of Borger, 767 F.2d 161, 166 (5th Cir.1985), certiorari denied, --- U.S. ----, 107 S.Ct. 1369, 94 L.Ed.2d 686:
 Peace officers stand at the front of law and the ordering processes of society. They restrain the violator, protect the compliant, and represent constituted authority in the scenes of both peace and turbulence of community life. We depend heavily upon their skill and disposition. They deserve and require the understanding and support of judges as well as of all citizens. Where any officer fails--whether for lack of courage, judgment, integrity, or humaneness--all the community suffers. We suffer because vested authority has failed to prevent some harm or because authority has been sullied and abused. With any abuse of authority the entire ordering process is weakened. The public trusts the entire process less, and antagonism to all figures of authority rises. No one should be more alert to the cost of failure than responsible law enforcement officers and we who work in the courts. We must do what we can to avoid the failures, to prevent their reoccurrence, and--at all times--stay true to the requisites of honesty and accountability imposed upon all who are at once representative of the law and subject to it.
 
 
 [1]
 Of the 63 officers killed in 1986, twenty-nine were killed in circumstances similar to the one encountered by Officer Berry; ten were killed in "traffic pursuits and stops," ten were killed "investigating suspicious persons and circumstances," and nine were killed in circumstances involving "robberies in progress or pursuing robbery suspects."
 
 
 [2]
 Under Illinois law, robbery is a Class 2 felony that carries a sentence of not less than three years and not more than seven years. Purse snatching, in the absence of the use of force or violence, is a Class 3 felony that carries a sentence of not less than two years and not more than five years
 
 
 [3]
 A "stick-up" given its plain meaning connotes armed robbery. The Illinois Annotated Statutes provides that: "A person commits armed robbery when he violates Section 18-1 while armed with a dangerous weapon." Ill.Rev.Stat. Ch. 38, Sec. 18-2 (emphasis added)
 
 
 [4]
 Testimony at trial provided:
 Q. What were you stopping for?
 A. I was stopping because the occupants of the vehicle who I observed I believed to be a suspect in a crime.
 * * *
 Q. Now do you--and you did feel this was a high risk stop, did you not?
 A. Yes, I did.
 
 
 [5]
 There was approximately seven to ten feet between the cars
 
 
 [6]
 Berry's testimony in relevant part provided:
 Q. Thank you. And so you said it three times, just like that, and in about that tone of voice, correct?
 A. I'd say so, yes.
 
 
 [7]
 Berry testified in relevant part:
 Q. Then what happened?
 A. Well, as I approached the vehicle, the driver's right hand went quickly into his coat and that is when I fired.
 Q. Do you recall seeing what the passenger was doing at that time?
 A. Just vaguely. It seemed to me as though the passenger in the car was somewhat hesitant--well, both were hesitant to even put their hands up. As I say, it took me three commands to get them to comply.
 It seemed to me as though the passenger was looking at the driver as more or less "What are we going to do next? "
 I don't know. It is just sort of vague, but the passenger was paying particular attention to the driver of the car.
 (Emphasis added).
 
 
 [8]
 The Majority claims that the car's occupants were sitting "peacefully" and "gave no indication that they would offer any resistance at all" (quoting Berry's testimony). But all of this changed when Sherrod suddenly lowered his hands and quickly reached inside his coat, as Klepfer's testimony makes clear. Further, the Majority selectively quotes the transcript to suggest that on cross-examination, Klepfer admitted Sherrod's movement was not suspicious, and that Sherrod did not appear to be reaching for a weapon. But Klepfer was emphatic on cross-examination that the movement of Sherrod's hand was "sudden" and "quite rapid." Klepfer also stated that the movement was not the sort of movement one makes in reaching for an object like a "glass of water." The logical inference is that Sherrod's movement was unnatural or unusually quick and thus was viewed by both Klepfer and Berry as most suspicious and threatening under all the facts and the circumstances
 
 
 [9]
 Testimony was also received at trial describing Waddell coming out of his car in a crouched position "with" his hand in his coat
 
 
 [10]
 The prejudice from these errors was exacerbated by the fact that the jury took into their deliberations typed copies of the court's misleading, confusing and contradictory instructions absent any reference to the limiting statement the district court gave one week earlier, during the trial
 
 
 [11]
 Officer Berry's discipline for the Bradley incident consisted of five days suspension without pay and in addition to working five extra days without pay